CENTRAL ILLINOIS PUBLIC SERVICE COMPANY *et al.*, Petitioners-Appellants, v. ILLINOIS COMMERCE COMMISSION *et al.*, Respondents-Appellees.

Fourth District    No. 4—94—0229

Argued December 13, 1994.—Opinion filed December 30, 1994.

Scott C. Helmholz (argued), of Sorling, Northrup, Hanna, Cullen & Cochran, Ltd., of Springfield, for petitioner Central Illinois Public Service Company.

Sarah J. Read (argued) and Anastasia M. Polek, both of Sidley & Austin, of Chicago, for petitioners Commonwealth Edison Company and Union Electric Company.

Roland W. Burris, Attorney General, of Chicago (James E. Weging, Special Assistant Attorney General (argued), of counsel), for respondent Illinois Commerce Commission.

Neil F. Flynn, of Springfield, and Richard J. Prendergast (argued), of Chicago, for respondent Illinois Cable Television Association.

Kelly Williams, Special Assistant Attorney General, of Springfield, for *amicus curiae* Joint Committee on Administrative Rules.

PRESIDING JUSTICE KNECHT delivered the opinion of the court:

Several electric utility companies (utilities) challenge an Illinois Commerce Commission (Commission) rule formulating a rental rate for cable television (CATV) attachments to poles owned by the utilities, promulgated pursuant to the Commission's authority under section 7—102(i) of the Public Utilities Act (Act) (220 ILCS 5/7—102(i) (West 1992)). We affirm.

## I. FACTS

A pole attachment agreement is an agreement in which CATV operators lease space from utilities on existing utility-owned poles to attach CATV cables in that space. Although the Federal Communications Commission (FCC) is given jurisdiction to regulate pole attachment agreements, the States are free to regulate pole attachments on their own. (47 U.S.C. § 224(c) (1988).) In Illinois, the Commission's jurisdiction over pole attachments was upheld in *Cable Television Co. v. Illinois Commerce Comm'n* (1980), 82 Ill. App. 3d 814, 403 N.E.2d 287.

In 1980, the Commission began conducting hearings, and in 1985, adopted a rate formula which was reversed on appeal for reasons not pertinent here. (Commonwealth Edison Co. v. Illinois Commerce Comm'n (Cir. Ct. Cook Co.), No. 85—CH—3743.) The cause was remanded to the Commission, and the Commission decided to hold new hearings regarding pole attachments, beginning in 1986. After extensive hearings, the Commission proposed a new rule on Septem-

ber 5, 1991. One issue in contention was the allocation of "neutral space" (safety clearance between wires on a pole). The Commission noted safety codes require a 40-inch clearance between electrical and communication wires, and then explained:

"The Commission, concludes from the evidence that: (1) the utility uses the neutral space and derives revenue from the use of the neutral space through installation of street lights in the neutral space and the sale of street lighting service; and (2) the CATV operator must pay to maintain the space through pole change outs if the neutral space is needed. The Commission is of the opinion that all parties attaching to a pole benefit to some extent from the clearances that are maintained between distribution lines which, in significant part, contribute to the safety of the workers. Therefore, it is fair and reasonable to assign 15% of the neutral space to the CATV operator; this results in an allocation of 6 inches of the 40[-]inch neutral space to the CATV operator."

The Commission then set a pole attachment rental rate as follows:

$$\text{"Rental Rate} = \frac{(\textit{Cost per pole}) \times (\textit{CATV Space}) \times (\textit{Carrying Charge})}{(\text{Total Usable Space})}\text{."}$$

"Cost per pole" is the utility's average pole cost. "Carrying charge" includes maintenance costs, administrative costs, depreciation, and taxes. "CATV space" is 1.5 feet of usable pole space, based on one foot of usable space physically occupied by CATV *and* a six-inch allocation of neutral space. "Total usable space" is based on a rebuttable presumption of 14 feet. See 83 Ill. Adm. Code § 315.20 (1994).

The Joint Committee on Administrative Rules (JCAR) failed to issue a statement of nonobjection to the rule, as required by the Illinois Administrative Procedure Act (Procedure Act) (5 ILCS 100/1—1 *et seq.* (West 1992)), so the proposed rule was republished on December 22, 1992. After additional comments, the Commission again proposed the rule in an order dated October 14, 1993. The Commission stated nothing during the first notice period had warranted a departure from the Commission's position that six inches of neutral space should be allocated to CATV.

Nevertheless, on December 14, 1993, JCAR voted to prohibit the filing of the proposed rule, declaring it:

"[I]s overburdensome for cable television companies, and will result in increased costs to cable television customers, constituting a serious threat to the welfare of the affected businesses and the citizens of this State.

The Filing Prohibition will be lifted if the ICC amends the rate formula to reflect the actual space used by CATV by removing from the formula the allocation of neutral space." 17 Ill. Reg. 22605 (1993).

On December 23, 1993, the Commission adopted a final rule. (See 83 Ill. Adm. Code § 315.10 (1994).) The rule was identical to the previous proposed rule *except* no neutral space was included in the definition of "CATV space." The Commission explained it had reevaluated the record, and found instructive the FCC's rejection of the allocation of neutral space to CATV under Federal law. The Commission also explained:

"The Commission is interested in establishing a rate which reflects the costs associated with the pole attachment, not the assorted benefits which the CATV operator derives from it. Users of poles arguably benefit from numerous governmental laws and regulations ***. Merely because a regulation explicitly effects [*sic*] certain measurements on a pole does not mean that benefits derived from the regulation should be reflected in a rate formula which purports to allocate *costs* to pole users. Neutral space is required on a joint use pole even if the cable operator does not attach to the pole. The asserted safety benefit is non-economic, difficult to quantify and bears an attenuated and abstract relationship to the cost allocation purpose of the rule." (Emphasis in original.)

The Commission denied petitions for rehearing, and the utilities now appeal the Commission's rule, arguing the Commission's order is invalid because it (1) violates section 7—102(i) of the Act, (2) is not supported by substantial evidence, (3) is not supported by adequate findings, (4) is arbitrary and capricious, (5) did not comply with the Procedure Act requirements regarding JCAR, and (6) did not comply with the Procedure Act requirements regarding the Commission.

## II. ANALYSIS

■ Rules, regulations, orders, or decisions of the Commission are considered *prima facie* reasonable, and the party appealing bears the burden of proof on all issues raised by the appeal. (220 ILCS 5/10—201(d) (West 1992).) Review of a Commission order is limited to the following questions: (1) whether the Commission acted within the scope of its authority, (2) whether the Commission made adequate findings in support of its decision, (3) whether the Commission's decision was supported by substantial evidence in the record, and (4) whether constitutional rights have been violated. (*Monarch Gas Co. v. Illinois Commerce Comm'n* (1994), 261 Ill. App. 3d 94, 97-98, 633 N.E.2d 1260, 1263-64.) Great weight and deference should be given to the Commission's decisions; and the administrative rules and regulations it promulgates, acting in its quasi-legislative capacity, enjoy a presumption of validity. Thus, a reviewing court may set aside a regulation promulgated by the Commission only if it is clearly

arbitrary, capricious, or unreasonable. *Monarch Gas*, 261 Ill. App. 3d at 97-98, 633 N.E.2d at 1263-64.

## A. *Section 7—102*

The utilities argue the Commission exceeded the scope of its authority under section 7—102(i) of the Act, which prohibits a public utility from, among other things, leasing its property without the Commission's approval. (220 ILCS 5/7—102(i) (West 1992).) The Commission may approve the lease only if "the public will be convenienced thereby." (220 ILCS 5/7—102(i) (West 1992).) The Commission's duty is "to insure that all persons desiring to use any part of [utility poles] bear reasonable shares of the costs incurred by the utilities in constructing, maintaining and owning them." (*Cable Television*, 82 Ill. App. 3d at 818, 403 N.E.2d at 289-90.) Although section 224(c) of title 47 of the United States Code provides a range of reasonableness within which the FCC may set pole attachment rates, Congress has declared it is not preempting State regulation concerning pole attachments, so the Commission is free to exceed the FCC rate range in determining reasonable shares of pole costs. 47 U.S.C. § 224(c) (1988).

The utilities assert the Commission breached its statutory duty to assign reasonable shares of pole costs by allocating to CATV too small a share in utility pole costs. During the rate hearings, CATV asserted a fair rental would be only the added, or incremental, costs to the utilities of CATV attaching to the utilities' poles. This would amount to a next-to-nothing rental rate because allowing CATV to attach to a pole involves little cost beyond initial make-ready work (work necessary to prepare a pole for CATV attachment) which CATV already pays. By contrast, the utilities asserted a cost-benefit analysis should be used, which would consider the *benefit* to CATV as well as the cost to the utilities. This methodology would approximate the cost of CATV purchasing joint ownership in the utilities' poles.

Between these two methodologies is a fully allocated cost methodology, adopted by the Commission and currently used by the FCC. (*Federal Communications Comm'n v. Florida Power Corp.* (1987), 480 U.S. 245, 253, 94 L. Ed. 2d 282, 291, 107 S. Ct. 1107, 1113 (FCC *maximum* allowable rate calculated by " 'multiplying the percentage of the total usable space *** which is occupied by the pole attachment by the sum of the operating expenses and actual capital costs of the utility attributable to the entire pole ***' 47 U.S.C. § 224(d)(1) [(1988)]" and is "the fully allocated cost of the construction and operation of the pole to which cable is attached").) Under this methodology, CATV pays an allocation of the full pole costs based on the fraction of usable pole space CATV physically occupies.

The utilities argue they are "subsidizing" CATV under a fully allocated cost methodology, because by allowing CATV to attach to the utilities' poles, the utilities save CATV the cost of planting its own poles or burying its cable. The utilities and CATV are, however, "subsidizing" each other in this sense, because by sharing poles, each helps the other avoid the costs of a solely owned pole. Indeed, avoiding costs is *precisely* the purpose behind sharing poles. Under the Commission's formula, CATV clearly receives the greater "subsidization" in this sense, because while the utilities avoid one-fourteenth of the cost of a shared electric/CATV pole, CATV avoids thirteen-fourteenths of the cost of the same pole. The question is whether this inequity in cost savings renders the Commission's formula unreasonable.

In adopting a fully allocated cost methodology, the Commission reached a reasoned choice. The utilities and CATV each argued for a different methodology—whichever methodology resulted in a rate most favorable to its side. Even in regard to the Commission's methodology, every element and subelement of the rate formula was contested by each of the parties. What is important is that the Commission's final adopted rate formula provides cost savings to *both* the utilities and CATV.

The Commission's fully allocated cost methodology may also be the most equitable methodology. Under an added cost methodology, the original pole owner receives no benefit in allowing new pole users to attach to a pole. Under a cost-benefit methodology, pole users occupying a smaller share of pole space pay a disproportionately large share of pole costs. However, under a fully allocated cost methodology, the full pole costs are divided among all pole users, allocated based on the fraction of usable space occupied by each pole user. Users occupying more pole space will pay a proportionately larger share of pole costs. It is true the original pole owner may pay a disproportionately large share of pole costs when there are only two users on the pole. However, as more users attach to the pole, each pole user, including the original pole owner, pays pole costs more proportionate to that user's actual pole usage.

In sum, the Commission's formula is not perfectly equitable, but provides cost savings to both the utilities and CATV with relative equity and administrative efficiency. Thus, the Commission's formula is reasonable.

## B. *Substantial Evidence*

The utilities next assert the Commission's failure to allocate the cost of neutral space to CATV is not supported by substantial evi-

dence. "Substantial evidence" has been defined as evidence which a reasoning mind would accept as sufficient to support a particular conclusion and consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. Further, a reviewing court must not put itself in the place of the Commission and conduct an independent investigation, nor should it substitute its judgment for that of the Commission. *City of Chicago v. Illinois Commerce Comm'n* (1993), 264 Ill. App. 3d 403, 409, 636 N.E.2d 704, 708.

■ The utilities assert the substantial evidence of record supports the conclusion CATV should have been allocated a share of neutral space. The utilities and CATV each point to evidence in the record tending to support their position on neutral space. We have carefully reviewed the voluminous testimony and evidence received during the Commission's investigational hearings. Witnesses for the various parties disputed the requirement for, and the possible uses of, neutral space. There also was a great range of diversity in the positions of the parties regarding the amount of neutral space that should be allocated to CATV. Under the "substantial evidence" standard, however, substantial evidence may support more than one possible finding, and possibly even several. The evidence only need be such that a reasoning mind would accept the evidence as sufficient to support a particular conclusion. Given the conflicts in testimony regarding neutral space, reasoning minds could differ whether any, or how much, neutral space should be allocated to CATV based on the evidence in the record. It is precisely this kind of technical issue which requires a reviewing court to defer to the expertise of the Commission.

The utilities, however, cite *Business & Professional People for the Public Interest v. Illinois Commerce Comm'n* (1989), 136 Ill. 2d 192, 228, 555 N.E.2d 693, 709, and *Commonwealth Edison Co. v. Illinois Commerce Comm'n* (1988), 180 Ill. App. 3d 899, 909, 536 N.E.2d 724, 730, for the proposition the Commission is entitled to less deference when it drastically departs from past practice. The utilities assert in December 1993, after nine years and seven orders, and only two weeks after it had last supported allocating neutral space to CATV, the Commission reversed its position and adopted a rate formula not allocating any neutral space to CATV. Although the utilities accurately chronicle the Commission's position on neutral space, the cited cases are inapposite. Those cases each involved the Commission departing "from its usual rules of decision to reach a different, unexplained result in a single case." (*Commonwealth Edison*, 180 Ill. App. 3d at 908-09, 536 N.E.2d at 730.) In other words, in those cases, a party did not receive equal treatment before the Commission. This

was not the situation in the present case. The Commission simply modified a proposed rule applicable to *all* utilities and CATV companies. Indeed, the Commission should not be constrained by its previous proposed rules. Otherwise, a proposed rule would carry with it an inertia making it difficult for the Commission to modify the rule, even when appropriate. The Commission's order was supported by substantial evidence in the record.

## C. *Adequate Findings*

The utilities next argue the Commission's order failed to contain adequate findings to support the Commission's decision to eliminate neutral space from the rate formula. To be considered adequate, the Commission's findings merely need be specific enough to allow intelligent review of the Commission's decision. The Commission need not make a finding on each evidentiary fact or claim. *City of Chicago*, 264 Ill. App. 3d at 409, 636 N.E.2d at 708-09.

■ The utilities allege the Commission did not explain why it was ignoring its earlier findings or why it was "reasonable" for utility customers to bear all of the costs of neutral space. Contrary to the utilities' assertions, these explanations appear directly in the Commission's final order, the relevant parts of which were set out in the facts. The Commission explained its rationale, and the facts upon which it relied, both in departing from its past decisions and in failing to allocate neutral space to CATV. These findings were specific enough to allow a court to make an intelligent review of the Commission's decision, and so the Commission's order was supported by adequate findings.

## D. *Arbitrary and Capricious*

The utilities next argue the Commission's order was arbitrary and capricious. The action of an administrative agency is arbitrary and capricious if the agency (1) relies on factors which the legislature did not intend for the agency to consider; (2) entirely fails to consider an important aspect of the problem; or (3) offers an explanation for its decision which runs counter to the evidence before the agency, or which is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *Greer v. Illinois Housing Development Authority* (1988), 122 Ill. 2d 462, 505-06, 524 N.E.2d 561, 581.

■ The utilities argue the Commission's order was based not on the record, but instead on a noncontrolling FCC decision issued in 1980. We disagree. The Commission expressly noted it was not controlled by the FCC's opinion, but found its reasoning "instructive."

Surely the legislature intended the Commission to adopt views with which it agreed. The *evidence*, however, upon which the Commission relied was solely the evidence of record.

The utilities also contend the Commission's formula fails to consider the costs CATV avoids by attaching to the utilities' poles. For the reasons explained earlier, we reject the argument against a fully allocated cost methodology. The Commission's rule was not arbitrary or capricious.

## E. *The Procedure Act and JCAR*

The utilities next assert JCAR violated the Procedure Act. JCAR is a legislative support services agency comprised of members of the General Assembly. (5 ILCS 100/5—90(a) (West 1992).) Under section 5—110(a) of the Procedure Act, JCAR may review a proposed rule on several bases. (5 ILCS 100/5—110(a) (West 1992).) JCAR may object to a proposed rule pursuant to this section, but the agency is still free to adopt the rule over JCAR's objections. 5 ILCS 100/5—110(c), (h) (West 1992).

However, under section 5—115(a) of the Procedure Act, JCAR may object to a proposed rule not only on the basis listed in section 5—110 of the Procedure Act, but also if JCAR finds the rule "would be objectionable under any of the standards for [JCAR's] review specified in Section 5—100, 5—105, 5—110, 5—120, or 5—130 *and* [(emphasis added)] would constitute a serious threat to the public interest, safety, or welfare." (5 ILCS 100/5—115(a) (West 1992).) When JCAR objects under section 5—115 of the Procedure Act:

> "The proposed rule *** shall not be accepted for filing by the Secretary of State nor take effect for at least 180 days after receipt of the statement by the Secretary of State. The agency may not enforce or invoke for any reason a proposed rule *** that is prohibited from being filed by this subsection during this 180[-]day period." (5 ILCS 100/5—115(b) (West 1992).)

During this 180-day period, JCAR must introduce in the General Assembly a joint resolution stating the General Assembly desires to continue the filing prohibition against the proposed rule. If the General Assembly adopts the resolution within the 180-day period, the agency is prohibited from filing the proposed rule and the proposed rule does not take effect. Otherwise, at the end of the 180-day period, the agency is free to adopt the proposed rule. 5 ILCS 100/5—115(c) (West 1992).

■ The utilities first argue JCAR objected to the proposed rate formula on an improper basis. This is plainly incorrect. Under sections 5—100(c) and 5—130(b)(4) of the Procedure Act (5 ILCS 100/

5—100(c), 5—130(b)(4) (West 1992)), JCAR may review economic effects of proposed rules, and under section 5—115 of the Procedure Act, JCAR may prohibit filing of a rule based on standards of review under sections 5—100 and 5—130 of the Procedure Act. Here, JCAR purported to object to the proposed rate formula because of its allegedly harmful economic effect on CATV and CATV subscribers, thereby satisfying the requirement of section 5—115 of the Procedure Act.

■ The utilities next argue JCAR failed to provide factual justification for its objection to the proposed rule, and JCAR's conclusions were unsupported by the record. The utilities do not cite, nor can this court find, any precedent for either of these assertions. Indeed, under the Procedure Act, only agencies are subject to these requirements. However, JCAR is not an "agency" because the Procedure Act defines "agency" as *not* including "[t]he House of Representatives and Senate and their respective standing and service committees." (5 ILCS 100/1—20(1) (West 1992).) Also, the Act limits court review of an adopted rule to whether the *Commission* provided sufficient factual justification for the rule it adopted, and whether the *Commission* findings were supported by the record. (220 ILCS 5/10—201(e)(iii), (e)(iv) (West 1992).) This makes sense as well, because JCAR does not promulgate administrative regulations, but rather only advises the Commission as to JCAR's *nonbinding* opinions. Generally, advisory recommendations by a legislative committee are not reviewable because there is no final reviewable order. *Constantine v. Village of Glen Ellyn* (1991), 217 Ill. App. 3d 4, 13-14, 575 N.E.2d 1363, 1370.

The utilities assert, however, if the Commission relies on JCAR's recommendations, then a reviewing court must examine the factual basis for JCAR's recommendations in the context of reviewing the *Commission* findings, which have impliedly adopted the findings of JCAR. We need not decide this issue, because here, the Commission did not adopt the *findings* of JCAR, but rather only its *position* as to the allocation of neutral space. Once again, the utilities do not cite, nor can this court find, any precedent for requiring a court to review the basis for a JCAR recommendation anytime an agency modifies a rule to conform to JCAR's recommendation. Indeed, subjecting a legislative advisory panel to the requirements of the Procedure Act anytime an administrative agency agreed with the position of the advisory panel would rewrite the Procedure Act's definition of "agency" to include legislative bodies or support services. This we decline to do.

■ The utilities also argue JCAR failed to present its findings to

the General Assembly, as they contend section 5—115 of the Procedure Act requires. This is plainly incorrect. Nothing in section 5—115 of the Procedure Act requires JCAR to present factual findings to the General Assembly when it introduces a joint resolution prohibiting the filing of a rule.

The utilities additionally argue JCAR created a "conditional filing prohibition," not provided for in the Procedure Act, when JCAR informed the Commission JCAR would lift its filing prohibition if the Commission amended the rate formula and removed the allocation of neutral space. A court's primary function in interpreting a statute is to ascertain and give effect to the intent of the legislature in enacting the statute. Courts should give statutory language its plain meaning and the fullest possible meaning to which it is susceptible, reading the statute as a whole, in order to effectuate legislative intent. *Metro Utility Co. v. Illinois Commerce Comm'n* (1994), 262 Ill. App. 3d 266, 273-74, 634 N.E.2d 377, 382.

■ Section 5—115 of the Procedure Act, although silent on whether JCAR can lift a filing prohibition, must be interpreted to allow such a decision. Otherwise, if JCAR could not lift a filing prohibition after the Commission amended a rule to conform to JCAR's objections, JCAR would be placed in the absurd position of introducing in the General Assembly a joint resolution to uphold a filing prohibition against a rule no longer being proposed. JCAR would be forced to proceed with a moot exercise, thereby wasting its time and resources and those of the General Assembly. Presumably to avoid such a result, the Illinois Administrative Code allows JCAR to withdraw a filing prohibition anytime before the General Assembly's adoption of the joint resolution continuing the filing prohibition. 1 Ill. Adm. Code § 220.1000(c)(6) (1992-93).

### F. *The Procedure Act And The Commission*
■ The utilities next assert the Commission violated the Procedure Act, first contending the Commission conducted its hearings as a "contested case," and therefore was required to base its decision solely on the evidence of record. We need not decide this issue. Section 10—103 of the Act declares:

> "In all proceedings, investigations or hearings conducted by the Commission, *** any finding, decision or order made by the Commission shall be based exclusively on the record for decision in the case ***." (220 ILCS 5/10—103 (West Supp. 1993).)

Under the plain language of section 10—103 of the Act, that section applies to a proceeding of the Commission regardless of whether it is

a "contested case." Thus, the issue is whether the Commission's order was based solely on the record. As was explained earlier, the Commission, although adopting the view of other bodies, based its decision solely on the evidence of its own record.

The utilities next contend the Commission erred by adopting the modified rate formula while JCAR's 180-day filing prohibition was in effect. Section 5—115 of the Procedure Act is silent on the proper procedure an agency must follow in modifying or withdrawing a proposed rule, rather than filing it over JCAR's objections when the 180-day filing prohibition expires. Again, a court's primary function in interpreting a statute is to ascertain and give effect to the intent of the legislature in enacting the statute. Courts should give statutory language its plain meaning and the fullest possible meaning to which it is susceptible, reading the statute as a whole, in order to effectuate legislative intent. *Metro Utility*, 262 Ill. App. 3d at 273-74, 634 N.E.2d at 382.

The utilities state the 180-day filing prohibition in section 5—115 of the Procedure Act applies regardless of the later action taken by the agency. Therefore, they conclude, the Commission violated the Procedure Act by adopting the rate formula within 180 days of JCAR's objection. We disagree. In the Procedure Act, the legislature intended to give JCAR the power to temporarily stop an agency from adopting or enforcing a regulation, while giving the General Assembly time to act to permanently stop the adoption or enforcement of the regulation. If both the Commission and JCAR agree on a *modified* rule, there is no longer any practical reason for requiring a 180-day waiting period prior to adoption of the rule. All that would result would be an unnecessary delay in the rulemaking procedure.

Further, this interpretation is consistent with section 5—115 of the Procedure Act, which prohibits the filing *only* of rules to which JCAR objects. Once a rule is modified to satisfy JCAR's objections, obviously it is no longer the rule to which JCAR objects, and therefore no longer the rule to which the filing prohibition applies. In that case, the procedures of section 5—110 of the Procedure Act would apply. Here, because the adopted rule met all of JCAR's objections, the filing prohibition no longer applied to it, so the Commission was free to adopt the rule pursuant to section 5—110 of the Procedure Act. This is true regardless of the manner, proper or otherwise, in which JCAR lifted or did not lift its filing prohibition against the *unmodified* rule to which JCAR objected.

## III. CONCLUSION

For the foregoing reasons, the decision of the Commission is affirmed in its entirety.

Affirmed.

GREEN and McCULLOUGH, JJ., concur.