AMEROPAN OIL CORPORATION, Intervenor and Petitioner-Appellant, v. ILLINOIS COMMERCE COMMISSION *et al.*, Respondents-Appellees.

First District (2nd Division)    No. 1—97—2762

Opinion filed July 21, 1998.

Arthur Sternberg, of Pederson & Houpt, of Chicago, for petitioner.

James E. Weging, Special Assistant Attorney General, of Chicago, for respondent Illinois Commerce Commission.

E. Glenn Rippie and Christopher W. Zibart, both of Hopkins & Sutter, and Pamela B. Strobe, both of Chicago, for respondent Commonwealth Edison Company.

JUSTICE TULLY delivered the opinion of the court:

Petitioner, Ameropan Oil Corporation, appeals the Illinois Commerce Commission's (ICC's) May 21, 1997, decision approving a petition filed by Commonwealth Edison Co. (ComEd) on August 15, 1996, to relocate a portion of a transmission line. The ICC had approved the transmission line's original location on January 27, 1993. This court has jurisdiction pursuant to the Illinois Public Utilities Act (Act) (220 ILCS 5/10—101 (West 1996)) and Supreme Court Rules 301 and 335 (134 Ill. 2d Rs. 301, 335).

## FACTUAL BACKGROUND

ComEd is a public utility regulated by the ICC according to the Act (220 ILCS 5/10—101 (West 1996)), and it is responsible for providing adequate, reliable and efficient service to customers in northern Illinois. It supplies electric power through its transmission system, which consists of 5,500 miles of lines carrying power at voltages of 138 kilovolts (kV) and above. The 138 kV system supplies downtown Chicago primarily through twelve 138 kV transmission line circuits, two of which are supported by the power line at issue in this case.

On January 27, 1993, the ICC issued to ComEd a certificate of public convenience and necessity (certificate) which authorized ComEd to construct, operate, and maintain a transmission line between two of ComEd's generating stations named Crawford and Fisk. The line was approximately 5.6 miles long and was entered into service soon after its approval in 1993. Since that time, the line has been one of several means of providing power to the central business district of Chicago.

The line ran in an east-west direction and was located north of Interstate 55 (I-55), also known as the Stevenson Expressway. The line made two crossings over I-55, one on either end of a 2,350-foot segment of the line, located south of I-55 near Western Avenue. That segment made a detour around petitioner's oil tank farm. The crossings were made pursuant to a permit issued by the Illinois Department of Transportation (IDOT). IDOT provided that the permit would terminate in anticipation of its then-planned construction of fly-over decks over I-55. The permit required ComEd to "actively pursue permanent relocation of said high voltage line to eliminate the necessity of its two temporary crossings of Interstate 55[, to] report to the

Director of Highways of the Department quarterly on the progress of the permanent location, and to remove the crossings not later than December 31, 1998." On February 15, 1995, IDOT notified ComEd that it would terminate the crossing permits and require ComEd by October 1996 to relocate the 2,350-foot segment of the line that was originally located south of I-55.

ComEd then investigated alternatives for relocating the line. In its August 15, 1996, ICC petition to amend the 1993 certificate, it proposed to relocate the affected 2,350-foot segment of the line to an area north of I-55, along existing Santa Fe Railroad rights-of-way on which other parts of the line were already built. The proposed route for the line would run near petitioner's oil storage tank farm. ComEd asserted that this alternative was the least-cost option and that it was the shortest route and occupied existing rights-of-way, which were available for voluntary acquisition. It also argued that the alternative route allowed construction to be completed before the summer of 1997. ComEd submitted that the proposed route met all applicable safety standards. According to ComEd, petitioner's safety concerns regarding the line's crossing the storage tank farm were unsubstantiated. The other alternative that ComEd considered was located north of petitioner's oil storage tank farm. ComEd did not select that alternative because it believed it would cost more than the first alternative, would require more time to acquire, and would present a clearance problem with a billboard.

Petitioner and the City of Chicago were granted leave to intervene in the 1996 proceeding to relocate the line. Petitioner opposed ComEd's petition and contended that the proposed relocation would place the line dangerously close to the oil storage tanks. Petitioner and ComEd filed written testimony. An ICC hearing examiner conducted an evidentiary hearing on January 16 and February 18, 1997. Petitioner and ComEd presented testimony. The evidence showed that ComEd wrote in a June 12, 1992, letter to the office of the mayor of Chicago that "[t]he portion of the proposed line west of Western Avenue must cross and extend along the south side of the Stevenson Expressway because there is insufficient room between [the oil tanks] on both sides of the [railway] to provide clearance to the tanks to meet NFPA [National Fire Protection Act] and City of Chicago regulations." John Schuh, ComEd's real estate administrator for acquisitions and permits, testified that on January 13, 1993, ComEd wrote to IDOT that the reason for the permit was that the "transmission line cannot continue on the Santa Fe Railroad property because [of] the gasoline tank clearance required by the 1990 [NFPA]."

Schuh also testified that ComEd searched for alternative routes,

but there were no feasible routes for purchase. According to Schuh, ComEd would not be able to secure a route in time to have the line in service by the summer. He also testified that the proposed relocation would not interfere with any commercial airports or heliports, would not affect any historic or archeological property, and would not cause the removal of any agricultural land.

Mark Lorenz, the siting and estimating engineer in the right-of-way and site-selection department of ComEd's transmission system area, testified that the removal of the 2,350-foot segment would be completed by October 1996 and that the removal would not affect customers during the winter months. However, according to Lorenz, the relocation needed to be completed before the 1997 peak load season. Lorenz explained how the relocated line would be constructed and stated that the line would comply with all applicable ICC regulations and orders. According to Lorenz, the proposed relocation route was ideal for construction, minimized land use impacts, was already covered by rights-of-way held by ComEd, and permitted relocation at the least cost. He testified that other than the proposed relocation route, ComEd considered the only other potential route, which would cross and parallel a canal and then cross back to the existing right-of-way. Lorenz testified that the alternative route was not feasible because the land rights were not readily available for voluntary purchase. In addition, that route would have physically conflicted with existing land uses, which would have increased the cost of the route. The proposed route would cost approximately $1.1 million, while the alternative route would cost approximately $3.8 million more than the proposed route. Finally, Lorenz testified that the proposed line would not pose a hazard to petitioner's oil storage tanks because the line would meet all applicable safety standards and would be designed in accordance with accepted engineering practices.

Richard Kraus, an engineer with Petroleum Safety Consultants, testified for petitioner. Kraus presented several reasons why he believed that the proposed line would unfavorably affect the oil storage tanks, including a likelihood of oil tank fires which could cause power outages. Clement Mesavage, Jr., an engineer who provides consulting services regarding bulk liquid terminal facilities, agreed with Kraus and provided additional testimony that oil tank fires could affect the line and create power outages. Also, he testified that in his experience, high voltage lines are not typically found near oil tank farms.

ICC staff expert witness Jack McDonald, a utility engineer in the engineering department of the Commission's Public Utilities Division, also testified. McDonald stated that the ICC had adopted the National

Electrical Safety Code and that, based on the hearing testimony, he concluded that the clearances for the proposed line were adequate. He recommended that the line be relocated in accordance with ComEd's proposal.

ComEd then presented detailed rebuttal testimony. In ComEd's expert witnesses' opinions, the proposed relocation route met all applicable safety standards.

At the end of the hearing, the ICC staff recommended granting the petition to amend the certificate of public convenience and necessity to relocate the line near petitioner's oil tank farm, stating:

> "After listening to the testimony the last two days, it seemed like the clearance problem is the main part of the case, and, as you know, the Commission has ad[o]pted the National Electrical Safety Code. And after listening to Mr. [C]lapp [one of ComEd's expert witnesses] today and the clearances that he has gone through, we feel that these clearances are adequate to relocate this line to this location [near the oil tank farm]."

The hearing examiner submitted a proposed order, which the ICC approved on May 21, 1997. In its May 21 order, the ICC found in pertinent part that the line was necessary to supply power to the central business district of Chicago and that ComEd's plan would assure continued adequate, reliable and efficient service to that area. It also found that the proposed relocation route was the least-cost feasible means of restoring service to the line. In addition, the ICC found:

> "Ameropan stated a number of concerns regarding the proposed relocation of the line. We also note that ComEd considered the safety concerns as expressed by Ameropan. With regard to those safety concerns ComEd had various experts conduct analy[s]es of the proposed line. We find the conclusions reached by those expert witnesses compelling. The Commission, on the other hand, finds Ameropan's position unsubstantiated by the evidence of record in this proceeding. Moreover, the Commission concludes that the evidence demonstrates that ComEd's proposal for the line not only meets but exceeds the applicable safety requirements."

Petitioner filed an application for rehearing, which the ICC denied on June 25, 1997. Ameropan filed its petition for review with this court, and the ICC moved to dismiss it for lack of jurisdiction. In its motion to dismiss the appeal, the ICC argued that petitioner failed to follow the notice requirements of the Act (220 ILCS 5/10—101 (West 1996)). According to the ICC, the Act alone determines our jurisdiction over this appeal. Ameropan argued that only Supreme Court Rules 301 and 335 (134 Ill. 2d Rs. 301, 335) determine our jurisdiction over this ap-

peal. We denied the ICC's motion to dismiss the appeal on October 6, 1997.[1]

## ISSUE PRESENTED FOR REVIEW

On appeal, petitioner argues that the ICC erred in granting ComEd's petition to amend the 1993 certificate to relocate the transmission line near petitioner's oil storage tanks because there was sufficient evidence of the danger of the line's proximity to the tanks.

## OPINION

■ "The powers of courts in reviewing orders issued by the [ICC] are limited" and "[i]t has long been recognized that upon appeal, the court exercises a statutory jurisdiction rather than a general, appellate jurisdiction." *City of Chicago v. Illinois Commerce Comm'n*, 264 Ill. App. 3d 403, 408, 636 N.E.2d 704, 707 (1993). According to the Public Utilities Act:

> "The findings and conclusions of the Commission on questions of fact shall be held prima facie to be true and as found by the Commission; rules, regulations, orders or decisions of the Commission shall be held to be prima facie reasonable, and the burden of proof upon all issues raised by the appeal shall be upon the person or corporation appealing from such rules, regulations, orders or decisions." 220 ILCS 5/10—201(d) (West 1996).

A reviewing court accords an ICC decision great deference because it is the " 'judgment of a tribunal appointed by law and informed by experience.' " *United Cities Gas Co. v. Illinois Commerce Comm'n*, 163 Ill. 2d 1, 12, 643 N.E.2d 719, 724 (1994), quoting *Village of Apple River v. Illinois Commerce Comm'n*, 18 Ill. 2d 518, 523, 165 N.E.2d 329, 331 (1960). The ICC is entitled to great deference additionally because their decisions "result from the deliberations of members who are better qualified to interpret evidence supplied by specialists and technicians." *People ex rel. O'Malley v. Illinois Commerce Comm'n*, 239 Ill. App. 3d 368, 392, 606 N.E.2d 1283, 1299 (1993). Furthermore, the ICC is entitled to great deference in its interpretation of the Public Utilities Act's provisions. *Central Illinois Public Service Co. v. Pollution Control Board*, 116 Ill. 2d 397, 507 N.E.2d 819 (1987). As the finder of fact, the ICC decides the credibility of expert witnesses and the weight to give their testimony. *People ex rel. Hartigan v. Illinois Commerce Comm'n*, 214 Ill. App. 3d 222, 573 N.E.2d 858 (1991). "An order of the Commerce Commission is presumed to be valid by the

---

[1]The ICC "renews its objection to the Court's jurisdiction" in its appellee's brief. We have ruled on the ICC's motion to dismiss on jurisdictional grounds and again reject the ICC's argument.

court in exercising an independent judgment in reviewing the order." *City of Chicago*, 264 Ill. App. 3d at 408, 636 N.E.2d at 707. An ICC order will be reversed only if it is outside the ICC's jurisdiction or is not supported by substantial evidence, or if the manner or proceedings in which the ICC arrived at the order violated the state or federal constitution or relevant laws and the appellant was prejudiced. *United Cities Gas Co.*, 163 Ill. 2d at 12, 643 N.E.2d at 724; 220 ILCS 5/10—201(e)(iv)(A) through (e)(iv)(D) (West 1996). "Substantial evidence" consists of evidence that a reasonable person would accept as sufficient to support a certain conclusion. *Central Illinois Public Service Co. v. Illinois Commerce Comm'n*, 268 Ill. App. 3d 471, 644 N.E.2d 817 (1994). It is more than a "mere scintilla of evidence but may be somewhat less than a preponderance." *Central Illinois Public Service Co.*, 268 Ill. App. 3d at 479, 644 N.E.2d at 823.

■ The Act states that no public utility shall construct a "new plant, equipment, property or facility which is not in substitution of any existing plant, equipment, property or facility or any extension or alteration thereof or in addition thereto" unless it receives an ICC certificate of public convenience and necessity. 220 ILCS 5/8—406(b) (West 1996). The ICC may grant such a certificate when the petitioning utility establishes:

> "(1) that the proposed construction is necessary to provide adequate, reliable and efficient service to its customers and is the least-cost means of satisfying the service needs of its customers; (2) with respect to gas and electric utilities, that the proposed construction is consistent with the most recent energy plan adopted by the Commission for the utility and the State, as updated; (3) that the utility is capable of efficiently managing and supervising the construction process and has taken sufficient action to ensure adequate and efficient construction and supervision thereof; and (4) that the utility is capable of financing the proposed construction without significant adverse financial consequences for the utility or its customers." 220 ILCS 5/8—406(b) (West 1996).[2]

Furthermore, "[i]n making its determination, the Commission shall attach primary weight to the cost or cost savings to the customers of the utility. The Commission may consider any or all factors which will or may affect such cost or cost savings." 220 ILCS 5/8—406(d) (West 1996).

Petitioner argues on appeal that the ICC's decision was in error because the approved relocation of the line is unreasonably dangerous. According to petitioner, the ICC's finding that the new location of the

---

[2]In this case, the petition was for an amendment to a previously issued certificate.

line meets the requirements of the National Electrical Safety Code (NESC) does not assure that the location is safe. In addition, petitioner submits that the NESC is not the exclusive safety code to be applied in this case and that the new location would not meet the safety requirements of the NFPA.

In part, petitioner relies on *Ness v. Illinois Commerce Comm'n*, 67 Ill. 2d 250, 367 N.E.2d 672 (1977), which is distinguishable from this case. In *Ness*, the ICC granted a certificate of public convenience and necessity to ComEd to construct a transmission line across the plaintiffs' farmland. The circuit court reversed the ICC's decision, and the supreme court affirmed the circuit court's decision. The issue in *Ness* was the effect of ComEd's two proposed routes through agricultural properties. In order to determine the route selection, the following criteria were used:

> " '[A] new right of way will be installed on a route that was selected to minimize the environmental impact of the line. To the greatest extent possible, the route will follow existing land use lines, will avoid conflict with existing structures, and will require a minimum of tree clearing.' " 67 Ill. 2d at 252.

After reviewing the record, the supreme court found that the ICC's decision was against the manifest weight of the evidence because manifestly better alternatives were available. *Ness* is inapplicable to the present case, in which the criteria are not limited to environmental impact concerns. The Public Utilities Act has been amended since *Ness* to include the criteria we have previously discussed.

■ In this case, the ICC reviewed the evidence and found that the "clearance problem"—the distance between the line and the oil tanks—was the main issue in the case. As the ICC has stated, it adopts the NESC. Applied to this case it found that the clearances satisfy NESC safety requirements. The ICC reached its conclusion after hearing expert testimony from petitioner and ComEd, and we accord its decision great deference. Petitioner rejects the ICC's conclusion and argues that the oil tanks pose a danger because of the possibility of tank fires or explosions. Petitioner's expert witness, Richard Kraus, testified that, if a fire occurred, the chance of the oil boiling over the tops of the tanks would be 100%. In addition, petitioner argues that an electrical conductor could fall and ignite an oil fire or exacerbate an existing oil fire. Petitioner also speculates about "the unexpected" occurring and makes irrelevant references to downed electrical lines in Canada, the Space Shuttle disaster, and the Titanic. Such speculation has no place in the ICC's decision or in our review of it. The ICC acknowledged petitioner's concerns and noted that ComEd's expert witnesses addressed those concerns. The ICC agreed with ComEd's

witnesses and found petitioner's "position unsubstantiated by the evidence." According to the ICC, "ComEd's proposal for the line not only meets but exceeds the applicable safety requirements." Our review of the record shows that the ICC heard the evidence and expert testimony, exercised its discretion in deciding the credibility of the witnesses, and issued an order that was supported by substantial evidence.

Furthermore, the ICC found that the proposed relocation line was the least-cost alternative. Petitioner does not dispute this and does not dispute that ComEd satisfied the other criteria found in section 8—406(b) of the Act. Petitioner's remaining arguments are that ComEd delayed its search for alternative lines, that it presented no evidence that the alternative route was unfeasible, and that there was no evidence that the line needed to be completed in time for the 1997 peak season. We will not address these arguments, because they are irrelevant to the criteria in section 8—406(b).

In sum, we find that the ICC's order was supported by substantial evidence. The ICC reviewed the evidence in light of the criteria in section 8—406(b) of the Act and properly exercised its discretion in making credibility determinations. Accordingly, we affirm the ICC's order.

Affirmed.

McNULTY, P.J., and COUSINS, J., concur.