# ILLINOIS OFFICIAL REPORTS

## Appellate Court

*Ameren Illinois Co. v. Illinois Commerce Comm'n*, 2012 IL App (4th) 100962

| | |
|---|---|
| Appellate Court Caption | AMEREN ILLINOIS COMPANY, Petitioner, v. (No. 4-10-0962) THE ILLINOIS COMMERCE COMMISSION; THE PEOPLE OF THE STATE OF ILLINOIS; THE CITY OF CHAMPAIGN; THE CITIZENS UTILITY BOARD; AARP; THE INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS (LOCAL) UNIONS 51, 309, 649, 702, AND 1306); THE GRAIN AND FEED ASSOCIATION OF ILLINOIS; CONSTELLATION NEWENERGY, INC.; CONSTELLATION NEWENERGY-GAS DIVISION, LLC; CHARTER COMMUNICATIONS, INC.; THE CITY OF URBANA; THE CITY OF DECATUR; THE TOWN OF NORMAL; THE CITY OF BLOOMINGTON; ILLINOIS INDUSTRIAL ENERGY CONSUMERS; AIR PRODUCTS & CHEMICALS COMPANY; ARCHER-DANIELS-MIDLAND COMPANY; ASF KEYSTONE; CARGILL, INC.; CATERPILLAR, INC.; CONOCOPHILLIPS; ENBRIDGE ENERGY, LLP; GBC METALS, LLC; ILLINOIS CEMENT COMPANY; LINDE NA, INC.; OLIN CORPORATION; TATE & LYLE INGREDIENTS AMERICA, INC.; UNITED STATES STEEL CORPORATION-GRANITE CITY WORKS; VISCOFAN USA, INC.; WASHINGTON MILLS HENNEPIN, INC.; and THE UNIVERSITY OF ILLINOIS Respondents.–AIR PRODUCTS & CHEMICALS COMPANY; ARCHER-DANIELS-MIDLAND COMPANY; ASF-KEYSTONE; CARGILL, INC.; CATERPILLAR, INC.; CONOCOCPHILLIPS COMPANY; ENBRIDGE ENERGY, LLP; GBC METALS COMPANY; ILLINOIS CEMENT COMPANY; LINDE NA, INC.; OLIN CORPORATION; TATE & LYLE INGREDIENTS AMERICA, INC.; THE UNIVERSITY OF ILLINOIS; UNITED STATES STEEL CORPORATION-GRANITE CITY WORKS; VISCOFAN USA, INC.; |

and WASHINGTON MILLS HENNEPIN, INC., Petitioners, v. (Nos. 4-10-0976, 4-11-0075) THE ILLINOIS COMMERCE COMMISSION; CENTRAL ILLINOIS LIGHT COMPANY, d/b/a AMERENCILCO, CENTRAL ILLINOIS PUBLIC SERVICE COMPANY, d/b/a AMERENCIPS, and ILLINOIS POWER COMPANY, d/b/a AMERENIP (Collectively AMEREN ILLINOIS); THE PEOPLE OF THE STATE OF ILLINOIS, by Lisa Madigan, Attorney General; AARP; THE CITIZENS UTILITY BOARD; the Cities of CHAMPAIGN, URBANA, DECATUR, and BLOOMINGTON; THE TOWN OF NORMAL; CONSTELLATION NEWENERGY-GAS DIVISION, LLC; THE GRAIN AND FEED ASSOCIATION; IBEW SYSTEM COUNCIL U-50, on Behalf of LOCALS 702, 51, 309, 1306, and 649; and THE KROGER COMPANY, Respondents.

| District & No. | Fourth District |
| --- | --- |
| | Docket Nos. 4-10-0962, 4-10-0976, 4-11-0075 cons. |

| Rule 23 Order filed | January 10, 2012 |
| --- | --- |
| Rule 23 Order withdrawn | March 13, 2012 |
| Opinion filed | January 10, 2012 |

Held

(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*)

In proceedings arising from petitioner's application for a rate increase of its electric- and gas-delivery services and the establishment of new riders, the appellate court affirmed the orders of the Illinois Commerce Commission granting petitioner an increase of $44 million, even though an increase of $226 million was requested, and a rider by which petitioner's tax liability under the Public Utilities Revenue Act could be collected from its customers.

| Decision Under Review | Petition for review of orders of Illinois Commerce Commission, Nos. 090306 through 090311. |
| --- | --- |

| Judgment | No. 4-10-0962, Affirmed. |
| --- | --- |
| | No. 4-10-0976, Affirmed. |
| | No. 4-11-0075, Dismissed. |

| | |
|---|---|
| Counsel on<br>Appeal | Edward C. Fitzhenry and Matthew Tomc, both of Ameren Services Company, Albert D. Sturtevant and Rebecca L. Segal, both of Carpenter Lipps & Leland, LLP, of Chicago, and Mark A. Whitt (argued) and Christopher T. Kennedy, both of Carpenter Lipps & Leland, LLP, of Columbus, Ohio, for petitioner. |
| | James E. Weging (argued), Special Assistant Attorney General, of Chicago, for respondent Illinois Commerce Commission. |
| | Lisa Madigan, Attorney General, of Chicago (Michael A. Scodro, Solicitor General, and Paul Berks, Assistant Attorney General, of counsel), for the People. |
| | Eric Robertson (argued), of Lueders, Robertson & Konzen, of Granite City, and Conrad R. Reddick, of Wheaton, for petitioners in Nos. 4-10-0976 and 4-11-0075 and respondents in No. 4-10-0962. |
| Panel | JUSTICE KNECHT delivered the judgment of the court, with opinion.<br>Presiding Justice Turner and Justice Appleton concurred in the judgment and opinion. |

## OPINION

¶ 1    Ameren Illinois Company, d/b/a Ameren Illinois, is a public utility company that distributes electricity and gas to consumers in roughly the lower two-thirds of Illinois. In June 2009, three utility companies, which ultimately merged to form Ameren Illinois, filed the underlying action: Illinois Power Company, d/b/a AmerenIP; Central Illinois Light Company, d/b/a AmerenCILCO; and Central Illinois Public Service Company, d/b/a AmerenCIPS (collectively referred to as Ameren Illinois).

¶ 2    In June 2009, Ameren Illinois sought a rate increase for both its electric- and gas-delivery services and the establishment of new riders. Initially, Ameren Illinois sought a rate increase of almost $226 million but later reduced its request to an increase of $130 million. The consolidated appeals follow the orders of the Illinois Commerce Commission (Commission) ultimately granting Ameren Illinois an increase of $44 million and granting Ameren Illinois a rider by which its tax liability under the Public Utilities Revenue Act (Revenue Act) (35 ILCS 620/2a.1 (West 2008)) will be collected from its customers.

¶ 3    Ameren Illinois appeals the orders, arguing the Commission unlawfully changed its rate-

making policy and the interpretation of its rules. Ameren Illinois contends the Commission's improper *pro forma* adjustments for accumulated depreciation reserve (ADR) and accumulated deferred income taxes (ADIT) unlawfully decreased Ameren Illinois's revenue requirement by $26 million.

¶ 4    The Illinois Industrial Energy Consumers (IIEC), which includes large electricity consumers such as the University of Illinois, Air Products and Chemicals Company, Archer-Daniels-Midland Company, Cargill, Inc., Caterpillar, Inc., and ConocoPhillips, appeals the Commission's decision granting Ameren Illinois a rider that allows Ameren Illinois to collect its Revenue Act tax expense through line itemization on the bills of Ameren Illinois customers. Before the Commission, IIEC filed two applications for rehearing and two appeals, appeal Nos. 4-10-0976 and 4-11-0075. In addition to challenging the Commission's decisions regarding the Revenue Act tax, IIEC urges this court to affirm the *pro forma* adjustments for ADR and ADIT.

¶ 5    The Commission, in addition to defending its decisions in the underlying rate case, contends this court lacks jurisdiction over appeal No. 4-11-0075. We dismiss appeal No. 4-11-0075 for lack of jurisdiction and affirm the Commission's decisions.

¶ 6                                            I. BACKGROUND

¶ 7    A utility initiates a rate case by filing tariffs that provide for a rate increase. *Commonwealth Edison Co. v. Illinois Commerce Comm'n*, 405 Ill. App. 3d 389, 394, 937 N.E.2d 685, 671 (2010) (citing 220 ILCS 5/9-201 (West 2006)). Upon such filing, the Commission suspends the tariffs and conducts an investigation and hearing. 220 ILCS 5/9-201(b) (West 2010). If the Commission begins a proceeding on the propriety of a utility's proposed rates, the utility bears the burden of showing the proposed rates are just and reasonable. 220 ILCS 5/9-201(c) (West 2010).

¶ 8    When establishing the rates a public utility may charge its customers, the Commission considers the utility's operating costs, rate base, and allowed rate of return. *Citizens Utilities Co. of Illinois v. Illinois Commerce Comm'n*, 124 Ill. 2d 195, 200, 529 N.E.2d 510, 512 (1988). "A public utility is entitled to recover in its rates certain operating costs" and "earn a return on its rate base, or the amount of its invested capital." *Citizens Utilities*, 124 Ill. 2d at 200, 529 N.E.2d at 512. "Recovery of the utility's operating costs and the return on its rate base is known as the utility's annual revenue requirement." *Commonwealth Edison*, 405 Ill. App. 3d at 394, 937 N.E.2d at 672. "The components of the ratemaking determination may be expressed in 'the classic ratemaking formula R (revenue requirement) = C (operating costs) + Ir (invested capital or rate base times rate of return on capital).' " *Citizens Utilities*, 124 Ill. 2d at 200-01, 529 N.E.2d at 512-13 (quoting *City of Charlottesville, Virginia v. Federal Energy Regulatory Comm'n*, 774 F.2d 1205, 1217 (D.C. Cir. 1985)).

¶ 9    As Ameren Illinois states, this appeal involves the rate-base component of the revenue requirement, as well as the treatment of ADR and ADIT. In determining a utility's rate base, the Commission may only include "the value of such investment which is both prudently incurred and used and useful in providing service" to the utility's customers. 220 ILCS 5/9-211 (West 2010). Affecting the value of a utility's rate base are both new investments and

the decline in value due to depreciation. *Commonwealth Edison*, 405 Ill. App. 3d at 395, 937 N.E.2d at 695. When depreciation loss is recorded, two accounts are affected: depreciation expense and accumulated depreciation. *Commonwealth Edison*, 405 Ill. App. 3d at 395, 937 N.E.2d at 695. Depreciation expense is the decline in value of an asset; it is recovered as part of the utility's operating costs. See *Business & Professional People for the Public Interest v. Illinois Commerce Comm'n*, 146 Ill. 2d 175, 239-40, 585 N.E.2d 1032, 1059 (1991) (hereinafter *BPI II*).

¶ 10 Accumulated depreciation is the total of the depreciation expense accrued on an asset since that asset was placed in service. *Commonwealth Edison*, 405 Ill. App. 3d at 395, 937 N.E.2d at 695. Assets' book values are determined by subtracting accumulated depreciation from the assets' cost. *Commonwealth Edison*, 405 Ill. App. 3d at 395, 937 N.E.2d at 695. Accumulated depreciation, however, cannot exceed the cost of the assets. *Commonwealth Edison*, 405 Ill. App. 3d at 395, 937 N.E.2d at 695.

¶ 11 As stated in Ameren Illinois's opening brief, ADIT quantifies "the income taxes that are deferred when the tax law provides for deductions with respect to an item in a year other than the year that the item is treated as an expense for financial reporting purposes." ADIT, for regulated entities, is treated as no-cost capital and reduces rate base.

¶ 12 To determine accurately a utility's revenue requirement, "a utility must present its rate data in accordance with a proposed one-year test year." *BPI II*, 146 Ill. 2d at 237-38, 585 N.E.2d at 1058. The use of a test year prevents a utility from overstating its revenue requirement by using low revenue data from one year and high expense data from another. *BPI II*, 146 Ill. 2d at 238, 585 N.E.2d at 1058.

¶ 13 At its option, a utility may propose *pro forma* adjustments to the test-year data in order to include known and measurable changes that would affect the operating results of the test year. See 83 Ill. Adm. Code 287.40 (2011). Section 287.40 of title 83 of the Illinois Administrative Code (Administrative Code) states the following:

"A utility may propose pro forma adjustments (estimated or calculated adjustments made in the same context and format in which the affected information was provided) to the selected historical test year for all known and measurable changes in the operating results of the test year. These adjustments shall reflect changes affecting the ratepayers in plant investment, operating revenues, expenses, and cost of capital where such changes occurred during the selected historical test year or are reasonably certain to occur subsequent to the historical test year within 12 months after the filing date of the tariffs and where the amounts of the changes are determinable." 83 Ill. Adm. Code 287.40 (2011).

¶ 14 A. The Rate Case

¶ 15 On June 5, 2009, Ameren Illinois filed tariffs proposing rates reflecting an increase in gas and electric delivery service of approximately $226 million. Later, Ameren Illinois revised its proposal for a rate increase of approximately $130 million. Ameren Illinois used the 2008 calendar year as its historical test year and proposed *pro forma* adjustments, including an adjustment for additional plant investment planned between the end of 2008 and May 2010.

During the case, Ameren Illinois changed the latter date to February 2010.

¶ 16    On July 8, 2009, the Commission suspended Ameren Illinois's proposed tariffs and initiated this case. Petitions seeking leave to intervene were filed by a number of entities, including the People of the State of Illinois and IIEC. Evidentiary hearings were held in December 2009.

¶ 17                          1. *Accumulated Depreciation*

¶ 18                          a. April 2010 Order

¶ 19    Before the Commission, Ameren Illinois maintained the plant-in-service component of the rate base reflected the historical cost of its capital assets used to provide service, less accumulated depreciation on those assets as of the end of the test year, December 31, 2008. In addition, Ameren Illinois maintained the rate base included known and measurable post-test-year *pro forma* capital additions that would be placed in service by February 2010. Ameren Illinois purported to have included adjustments to accumulated depreciation to reflect additional depreciation associated with the *pro forma* capital additions. Ameren Illinois maintained its methodology had been endorsed by the Commission.

¶ 20    IIEC maintained Ameren Illinois's approach overstated its net plant and rate base because Ameren Illinois accounted for the plant addition increases to gross utility plant but ignored the contemporaneous offset of changes in accumulated depreciation. IIEC argued plant additions would not increase the net plant because those additions would be offset by increases to ADR and ADIT that would occur during the same post-test-year *pro forma* time period.

¶ 21    The Commission found the 2008 historical test year was permissible under the Commission's rules. The Commission acknowledged IIEC pointed to evidence distinguishing the record from this case from the recent decisions Ameren Illinois asked the Commission to follow. The Commission held that "[a] fresh look" at the competing proposals, "aided by evidence presented for the first time in this record," shows IIEC's objections are "well founded." The Commission further found it had not in the earlier decisions cited by Ameren Illinois addressed the effect of section 9-211 of the Public Utilities Act (220 ILCS 5/9-211 (West 2008)) in this context. The Commission concluded two parts of the record evidence were "particularly compelling." The first was that of the staff's accounting expert who opined the regulatory accounting required the plant-in-service balance and the accumulated reserve for depreciation balance be representative of the same point in time. The second was IIEC's analysis showing the result of the policy that allowed only one part of net plant in determining rate base. Particularly compelling to the Commission was the evidence showing Commonwealth Edison, in a recent case, benefitted from "a significantly overstated rate base" as a result of not applying ADR.

¶ 22    The Commission mandated Ameren Illinois reflect the balance of ADR and ADIT as of February 2010 in its rate base because Ameren Illinois had included *pro forma* plant additions in its rate base as of the same date. The Commission concluded, "Section 9-211 essentially requires the Commission to ensure that a utility's approved rate base does not exceed the investment value the utility actually uses to provide service." The Commission

continued, "The measure of the amount of investment so dedicated must account for both increases and decreases (over a consistent period) at any point in time." At the conclusion of this part of its ruling, the Commission noted the following for future rate cases: "To avoid confusion respecting proposals in future rate cases, the Commission finds that if a utility has recovered in rates the cost of an asset through depreciation expense, the associated amount of accumulated depreciation should be deducted from rate base."

¶ 23                    b. The May 2010 Application for Rehearing

¶ 24    Ameren Illinois filed an application for rehearing, asking the Commission to reconsider the Commission's *pro forma* adjustments for ADR and ADIT. Ameren Illinois argued the Commission's adjustment violated test-year rules, constituted a reversal in Commission policy, understated significantly Ameren Illinois's actual net plant, calculated an adjustment to the ADR and ADIT that had not been proposed, and contained accounting errors.

¶ 25    The Commission granted Ameren Illinois's application. The IIEC and the State advocated the "roll forward" adjustments for ADR and ADIT, but the two parties disagreed as to methodology and amounts.

¶ 26                  c. The *Commonwealth Edison* September 2010 Decision

¶ 27    On September 30, 2010, the Second District entered its opinion in *Commonwealth Edison*, reaching the same decision on accumulated depreciation as the Commission did in April 2010. In *Commonwealth Edison*, the Commission's order, consistent with a stipulation between Commonwealth Edison (ComEd) and the staff, included in ComEd's rate base *pro forma* capital additions through June 2008 but did not include the increase in the accumulated reserve for depreciation of the embedded or existing plant. *Commonwealth Edison*, 405 Ill. App. 3d at 404, 937 N.E.2d at 702.

¶ 28    On appeal, IIEC maintained (1) the Commission exceeded its authority because the rate-base increase violated section 9-211 of the Public Utilities Act, (2) the Commission violated the Administrative Code "by mismatching 2008 gross plant investment and 2006 test-year accumulated depreciation," and (3) the Commission was not bound by its earlier decisions to the contrary. *Commonwealth Edison*, 405 Ill. App. 3d at 404, 937 N.E.2d at 702-03. Regarding section 9-211, the Second District held "[s]ection 9-211 essentially requires the Commission to ensure that a utility's approved rate base does not exceed the investment value that the utility actually uses to provide service" and "[t]he measure of the amount of investment so dedicated must account for both increases and decreases over a consistent period." *Commonwealth Edison*, 405 Ill. App. 3d at 405, 937 N.E.2d at 703. By not including both the increases and decreases, the Commission, according to the Second District, "approved a rate base that exceeds the investment value ComEd actually dedicates to utility services." *Commonwealth Edison*, 405 Ill. App. 3d at 405, 937 N.E.2d at 703.

¶ 29    The Second District further found section 287.40 of title 83 of the Administrative Code, which governs *pro forma* adjustments to a historical test year, establishes an "increase in the accumulated depreciation on the existing plant during the post-test-year period, in which the additional plant is being factored into the rate base, is a change that affects ratepayers and

-7-

*** must be factored into the rate base." *Commonwealth Edison*, 405 Ill. App. 3d at 406, 937 N.E.2d at 704. In addition, the Second District determined ComEd's position to the contrary is inconsistent with the matching principles of section 287.20 and concluded the Commission abused its discretion in excluding from the rate base the increase in accumulated depreciation during the *pro forma* period. *Commonwealth Edison*, 405 Ill. App. 3d at 420, 937 N.E.2d at 715.

¶ 30                    d. The Commission's November 2010 Order on Rehearing

¶ 31    In its November 2010 order on rehearing, the Commission remained unpersuaded it was "altering the manner that it adjusts accumulated depreciation reserve" and concluded no additional steps needed to be taken before making "such an adjustment." The Commission observed "Staff has pointed out that multiple orders over the years have reflected an adjustment for accumulated depreciation through the *pro forma* adjustment period while other orders have not." The Commission stated it had "relied on the record in the various cases in coming to its conclusions."

¶ 32    The Commission further concluded the failure to estimate actual net plant would have been avoided had Ameren Illinois "more accurately estimated its plant additions for this period" and such failure was "not indicative of weakness in the Commission's conclusion." The Commission concluded the order on rehearing "should reflect an aggregated reduction to the reserve for accumulated depreciation of $15.2 million for all six Ameren Illinois utilities." The Commission further concluded the appropriate valuation of aggregated net plant for the six utilities was $3.352 billion.

¶ 33                              2. *The Revenue Act Tax*

¶ 34                                a. Background

¶ 35    In every rate case, the Commision determines what part of the utility's costs each class of customers will be responsible for. Ameren Illinois has five rate classes, ranging from DS-1, residential customers, to DS-5, providers of street lighting and protective lighting service. DS-4 contains the largest customers, with demands exceeding 1,000 kilowatt-hours (kWh). IIEC companies fall within DS-4. According to the April 2010 order, the general preference of the Commission is to allocate costs among these classes "as close to the cost of serving each class as is reasonably possible and/or appropriate." To do this, the Commission typically uses a cost of service study (COSS) that compares the costs of each customer class to revenues produced by each class. At times, certain circumstances warrant allocating costs on non-cost-based criteria.

¶ 36    This case concerns the Commission's decision on how to allocate Ameren Illinois's tax expense under the Revenue Act. Utilities became subject to a tax on invested capital under the Revenue Act shortly after the personal property tax was eliminated in 1970. See 35 ILCS 620/2a.1 (West 1996); see also 35 ILCS 620/1a (West 2010). This tax was initially assessed on utilities at a rate of 0.8% of the utility's invested capital. 35 ILCS 620/2a.1 (West 1996). Effective January 1, 1998, however, the legislature altered section 1a of the Revenue Act by deleting the reference to the tax assessment at a rate of 0.8% and imposing a tax on the utility

based on the amount of kWh distributed. See Pub. Act 90-561, art. 3, § 25, eff. Jan. 1, 1998 (1997 Ill. Laws 6302, 6305); see also 35 ILCS 620/2a.1(a) (West 2010).

¶ 37                                  b. The Commission's April 29, 2010, Order

¶ 38     Here, Ameren Illinois proposed to the Commission that its Revenue Act tax liability be allocated and collected from its customers based on kWh sales. IIEC opposed Ameren Illinois's proposal. Before the Commission, IIEC maintained the Revenue Act tax should be allocated on a demand basis by the same manner it was assessed and collected before the 1997 revisions to the Revenue Act. IIEC contended kWh sales are only one of several factors that determine a utility's Revenue Act tax responsibility. IIEC maintained the main factor determining Revenue Act tax liability was the utility's 1997 level of invested capital. IIEC argued the tier levels set forth in the Revenue Act were created to approximate the same level the utilities had paid based on invested capital.

¶ 39     IIEC further maintained there was a very weak correlation between kWh sales and the utilities' Revenue Act tax liabilities. IIEC also argued most of the current Revenue Act tax was inherited 1997 invested capital tax. IIEC maintained the Revenue Act's language did not express an expectation tax burdens would be shifted from one customer class to another.

¶ 40     Ameren Illinois argued IIEC's approach was improper because, under the new tax structure, as a utility delivers more or less energy, the tax amount will increase or decrease no matter the amount of capital investment. Ameren Illinois also maintained its proposal was consistent with clear legislative intent.

¶ 41     The staff agreed with Ameren Illinois. The staff recognized Ameren Illinois's proposal would shift responsibility for tax costs from smaller to larger customers on the system. The DS-4 customers, who accounted for 43% of the system usage, would be allocated 43% of the Revenue Act tax costs, while those customers at the time accounted for only 8% of the costs. The residential DS-1 customers' allocation would decline from 56% to 30%. Staff maintained plant in service was no longer a part of the Revenue Act tax determination.

¶ 42     The Commission found interesting IIEC's argument invested capital (or plant in service), not kWh, was the primary cost causer. The Commission, however, citing section 1a of the Revenue Act, concluded the legislature intended to replace the plant-in-service tax with a kWh tax "in response to the changing nature of the Illinois electric utility industry," in which utilities had shed much of their plant in service and became regulated distribution utilities.

¶ 43     The Commission determined Ameren Illinois's and the staff's interpretation of the Revenue Act was more reasonable, stating the following:

> "In the absence of any clear legislative intent to the contrary, [Ameren Illinois] should recover [Revenue Act] tax costs in base rates through the kWh-based Distribution Delivery Charge from the DS-1, DS-2, and DS-5 classes. [Ameren Illinois] should create a kWh charge to reflect the [Revenue Act] tax allocation that applies to the DS-3 and DS-4 classes."

¶ 44     The Commission also found, while addressing the issue of rate mitigation for the rate classes, the Revenue Act tax should be recovered as a separate line item on bills. The

Commission determined "ratepayers should be made aware of taxes they are being charged."

¶ 45                 c. IIEC's June 2010 Application for Rehearing

¶ 46      Following the Commission's April 2010 order and May 6, 2010, corrected order, IIEC filed its first application for rehearing. Attached to IIEC's application is an affidavit by Robert R. Stephens, an expert who testified in the initial hearing. According to Stephens, Ameren Illinois, through its rates that took effect in early May 2010, was not collecting the Revenue Act tax expenses through base rates, but primarily through tax additions riders. Stephens opined Ameren Illinois's rates would collect almost $4 million more than the amount approved by the Commission. IIEC also asked the Commission to reverse its decisions allocating the Revenue Act tax on kWh delivered and collecting the Revenue Act tax on a separate kWh charge for DS-3 and DS-4 classes.

¶ 47      On June 15, 2010, the Commission issued a "Notice of Commission Action," granting in part and denying in part IIEC's application for rehearing. In this notice, the Commission stated it had intended to treat the Revenue Act tax as a pass-through tax, which would appear as a line item on the customer's bill:

> "With regard to the [Revenue Act] tax and its recovery, it was the Commission's intent in its Order to exclude the [Revenue Act] tax from the revenue requirement, treat the [Revenue Act] tax as a pass[-]through tax, have the [Revenue Act] tax recovered through a volumetric charge, and have the [Revenue Act] tax separately identified as a line item on the customer's bill as other pass-through taxes are identified."

¶ 48      Subsequently, IIEC sought clarification on the partial grant of its application for rehearing. This request was denied. At the rehearing proceeding, IIEC presented additional evidence to show the Revenue Act tax was not a pass-through tax.

¶ 49                 d. The Commission's November 2010 Order on Rehearing

¶ 50      In its November 4, 2010, order on rehearing, the Commission made no findings regarding IIEC's pass-through tax argument. Instead, the Commission noted it had expressed the intent to exclude the Revenue Act tax from the revenue requirement and treat the Revenue Act tax as a pass-through tax.

¶ 51                 e. IIEC's December 2010 Application for Rehearing

¶ 52      On December 6, 2010, IIEC filed its second application for rehearing, seeking rehearing on the November 4, 2010, Commission order. IIEC argued, in part, the Commission's notice of commission action contradicted its April 2010 order, in which the Commission found the Revenue Act tax should be recovered in base rates. IIEC further argued no findings or analysis to support the Commission's determination appears in its notice. IIEC asked for a rehearing on these matters. The Commission denied IIEC's rehearing application.

¶ 53                          B. Motion To Consolidate Appeals

¶ 54        Three appeals were filed regarding this rate case: case Nos. 4-10-0962, 4-10-0976, and
            4-11-0075. In case No. 4-10-0962, on December 6, 2011, Ameren Illinois filed its notice of
            appeal of the Commission's orders. Two days later, in case No. 4-10-0976, IIEC filed its
            notice of appeal. After the Commission denied IIEC's December 2010 application for
            rehearing, IIEC, in January 2011, filed its second appeal in case No. 4-11-0075.

¶ 55        In January 2011, IIEC moved to consolidate the appeals in case Nos. 4-10-0962 and 4-
            10-0976. The motion was unchallenged and the appeals were consolidated.

¶ 56        In March 2011, IIEC moved to consolidate the appeal in case No. 4-11-0075 with the
            consolidated appeals in case No. 4-10-0962 and case No. 4-10-0976. On March 7, 2011, the
            Commission moved to dismiss case No. 4-11-0075 on jurisdictional grounds. On March 24,
            2011, this court consolidated the appeals but determined we would consider the
            Commission's jurisdictional arguments with the case.


¶ 57                                 II. ANALYSIS

¶ 58                              A. Standards of Review

¶ 59        On appeal of a rate case, this court will reverse a Commission decision if we find one of
            the following: (1) "[t]he findings of the Commission are not supported by substantial
            evidence based on the entire record"; (2) the Commission lacked jurisdiction over the
            decision; (3) the decision violates state or federal law; or (4) "[t]he proceedings or manner
            by which the Commission considered and" made its decision violated state or federal laws
            to the prejudice of the appellant. 220 ILCS 5/10-201(e)(iv) (West 2010); see also *Central
            Illinois Public Service Co. v. Illinois Commerce Comm'n*, 268 Ill. App. 3d 471, 476, 644
            N.E.2d 817, 821 (1994).

¶ 60        When considering the propriety of a Commission decision, we take the findings and
            conclusions of the Commission on questions of fact as *prima facie* true and consider any
            rule, regulation, order, or decision of the Commission to be *prima facie* reasonable. 220
            ILCS 5/10-201(d) (West 2010). "[T]he burden of proof upon all issues raised by the appeal
            shall be upon the person or corporation appealing from such rules, regulations, orders or
            decisions." 220 ILCS 5/10-201(d) (West 2010).

¶ 61        The Commission's interpretation of a statute it is charged with administering and
            enforcing is entitled to substantial weight and deference. *People ex rel. Birkett v. City of
            Chicago*, 202 Ill. 2d 36, 46, 779 N.E.2d 875, 881 (2002). "[A] reasonable construction of an
            ambiguous statute by the agency charged with that statute's enforcement, if
            contemporaneous, consistent, long-continued, and in concurrence with legislative
            acquiescence, creates a presumption of correctness that is only slightly less persuasive than
            a judicial construction of the same act." *Birkett*, 202 Ill. 2d at 46, 779 N.E.2d at 881. A court
            may overturn the Commission's interpretation of its own rules if its construction is clearly
            erroneous, arbitrary, or unreasonable. See *Illinois Federation of Teachers v. Board of
            Trustees*, 191 Ill. App. 3d 769, 774, 548 N.E.2d 64, 67 (1989). Less deference will be
            afforded, however, when the Commission's decision is a departure from past practice.
            *Business & Professional People for the Public Interest v. Illinois Commerce Comm'n*, 136

                                         -11-

Ill. 2d 192, 228, 555 N.E.2d 693, 709 (1989) (hereinafter *BPI I*) ("[N]o matter how much discretion the Commission is afforded under the [Public Utilities] Act, its decisions are entitled to less deference when it drastically departs from past practice.").

¶ 62    In contrast, the Commission's interpretation of a statute it is not charged with administering and enforcing is not entitled to any deference. Such interpretation is a question of law, which we review *de novo* (*BPI I*, 136 Ill. 2d at 204, 555 N.E.2d at 698).

¶ 63                                B. ADR and ADIT

¶ 64            1. *Section 10-101 Did Not Bar the Commission's Decision*
                          *Concerning ADR and ADIT*

¶ 65                           a. Ameren Illinois's Argument

¶ 66    Ameren Illinois first argues the Commission's order violates Illinois law because the Commission improperly changed its rules regarding the application of accumulated depreciation without providing prior notice of the change or instituting a rulemaking proceeding under section 10-101 of the Public Utilities Act (220 ILCS 5/10-101 (West 2008)). Section 10-101 provides in relevant part:

> "Any proceeding intended to lead to the establishment of policies, practices, rules or programs applicable to more than one utility may, in the Commission's discretion, be conducted pursuant to either rulemaking or contested case provisions, provided such choice is clearly indicated at the beginning of such proceeding and subsequently adhered to." 220 ILCS 5/10-101 (West 2008).

¶ 67    Ameren Illinois argues the Commission's orders "represent a drastic departure from established Commission policy" and, thus, section 10-101's hearing and notice requirements were triggered. In support, Ameren Illinois cites orders of the Commission dated 2003 through September 2008, nine months before Ameren Illinois's June 2009 rate filing, in which the Commission rejected the argument ADR and ADIT should be rolled forward to coincide with *pro forma* adjustments. In *Commonwealth Edison Co.*, Ill. Comm. Comm'n No. 01-0423, the Commission approved a *pro forma* adjustment, but rejected a proposed depreciation reserve adjustment, upon concluding such an adjustment would improperly shift the test year. See *Commonwealth Edison Co.*, 224 P.U.R.4th 357, 2003 Ill. PUC LEXIS 311, at *112 (Mar. 28, 2003). In *Commonwealth Edison Co.*, Ill. Comm. Comm'n No. 05-0597, the Commission rejected the same argument on the same basis, finding in part "Commission rules and test year ratemaking principles prohibit such an adjustment." *Commonwealth Edison Co.*, 250 P.U.R.4th 161, 2006 Ill. PUC LEXIS 43, at *33 (July 26, 2006). The Commission noted the intervenor's "proposal merely [took] one part of the rate base and move[d] it one additional year into the future." *Id.* In *North Shore Gas Co./Peoples Gas Light & Coke Co.*, Ill. Comm. Comm'n Nos. 07-0241, 07-0242 cons., the Commission again rejected the same accumulated-depreciation adjustment. The court found the earlier decision in *Commonwealth Edison Co.*, Ill. Comm. Comm'n No. 05-0597, controlling and followed it to avoid an arbitrary and capricious action. See *North Shore Gas Co.*, Ill. Comm. Comm'n Nos. 07-0241, 07-0242 cons., at 16, http://www.icc.illinois.gov/docket/files.aspx?no=07-0241&docId=119858 (Final Order Feb. 5, 2008).

¶ 68　　In September 2008, in *Commonwealth Edison Co.*, Ill. Comm. Comm'n No. 07-0566, the Commission again rejected the roll-forward adjustment. The Commission found "these arguments are not novel arguments as the Commission has reviewed the merits of this position in at least three cases in the recent past." *Commonwealth Edison Co.*, Ill. Comm. Comm'n No. 07-0566, at 28, http://www.icc.illinois.gov/docket/files.aspx?no=07-0566&docId=128596 (Final Order Sept. 10, 2008). The Commission concluded it "strove to make clear" that the adjustment was improper. *Id.* at 29. The Commission stated in order for it "to do an about face with regard to its prior decisions," a party must make a clear showing with proper evidentiary and legal support. *Id.* at 30. Ameren Illinois further noted throughout the appeal in the Second District's *ComEd* decision, the Commission defended its determinations rejecting the roll-forward adjustment.

¶ 69　　According to Ameren Illinois, the Commission's "about face" on this requirement violates precedent as shown in *BPI I* and *BPI II*. Ameren Illinois maintains both of these cases establish the Commission violates section 10-101 when it changes a rule, policy, or practice without first providing a proceeding on the proposed change.

¶ 70　　Ameren Illinois further maintains the Commission's abrupt change without notice and a proceeding violated its rights to due process because it may not arbitrarily abandon prior interpretations of its rules. See *Citizens Utility Board v. Illinois Commerce Comm'n*, 166 Ill. 2d 111, 132, 651 N.E.2d 1089, 1099-1100 (1995).

¶ 71　　　　　　　　　　b. Commission's and IIEC's Arguments

¶ 72　　The Commission acknowledges, since the adoption of section 287.40, it generally had not imposed post-test-year accumulated depreciation from the embedded-rate-base adjustment when post-test-year, *pro forma* capital adjustments were added to the rate base. The Commission emphasizes, however, previous cases in which post-test-year ADR was applied due to an agreement between the utility and staff. See, *e.g.*, *Illinois Gas Co.*, No. 08-0482, 2009 WL 2355058, at 3, 5 (Ill. Comm. Comm'n Apr. 24, 2009). The Commission also notes one case, involving a predecessor of Ameren Illinois, in October 2003 where the Commission imposed post-test-year ADR from the embedded rate base when post-test-year *pro forma* capital adjustments were made and there was declining or relatively static amounts of historical net plant in service. See *In re Central Illinois Public Service Co.*, No. 02-0798, 2003 WL 23473070, at *7-*8 (Ill. Comm. Comm'n Oct. 22, 2003). The Commission further maintains two commissioners dissented from the September 2008 order in the 2008 *ComEd* case, urging an adjustment for ADR should be imposed in all cases when post-test-year *pro forma* capital adjustments were allowed to the rate base. See *Commonwealth Edison Co.*, Ill. Comm. Comm'n No. 07-0566, http://www.icc.illinois.gov/docket/files.aspx?no=07-0566&docId=130490 (Nov. 7, 2008) (Lieberman and Elliott, dissenting).

¶ 73　　The Commission also contends the application of section 10-101 in this scenario would have an absurd result. To accept Ameren Illinois's interpretation of section 10-101 of the Public Utilities Act, the Commission reasons, would result in a situation where the Commission, in determining just and reasonable rates, would have to wait until the resolution of a future case to comply with its statutory duty because of decisions in earlier rate cases.

Instead, the Commission emphasizes the fact it has the authority to determine each case before it freely because it "is not a judicial body and its orders do not have the effect of *res judicata*" (*Lakehead Pipeline Co. v. Illinois Commerce Comm'n*, 296 Ill. App. 3d 942, 956, 696 N.E.2d 345, 354 (1998)). The Commission further maintains the law permits it to deviate from past practices without triggering a reversal. See generally *Citizens Utility Board*, 166 Ill. 2d at 132, 651 N.E.2d at 1099 ("[W]here the Commission's decisions drastically depart from past practices, they are entitled to less deference.").

¶ 74    IIEC further agrees section 10-101's requirements are not implicated here. IIEC contends this case is not a "proceeding intended to lead to the establishment of policies, practices, rules or programs applicable to more than one utility." 220 ILCS 5/10-101 (West 2008).


¶ 75                                c. Conclusion

¶ 76    We disagree with Ameren Illinois that the Commission's decision in this case is an arbitrary abandonment of prior interpretation of its rules. As it argues above, the Commission is authorized to determine each case before it, even when it considers issues identical to those in a previous case. See *Lakehead Pipeline Co.*, 296 Ill. App. 3d at 956, 696 N.E.2d at 354.

¶ 77    Ameren Illinois goes to great lengths to show the Commission repeatedly and consistently refused to impose post-test-year ADR from the embedded-rate-base adjustment when post-test-year, *pro forma* capital adjustments were added to the rate base. The record and cases show, however, the Commission's decision that resulted in a change in the way the Commission will apply post-test-year ADR was not arbitrary. The Commission's April 2010 order shows the Commission, when reaching its decision, considered evidence showing "the adjustment approved in a *recent* Commonwealth Edison case" resulted in "a significantly overstated rate base." (Emphasis added.) The Commission also noted it considered a legal argument not addressed in the cases cited by Ameren Illinois: the application of section 9-211 of the Public Utilities Act (220 ILCS 5/9-211 (West 2008)). In this case, the Commission, noting the Ameren Illinois cases did not address section 9-211 in this context, concluded section 9-211 "essentially require[d] the Commission to ensure that a utility's approved rate base does not exceed the investment value the utility actually uses to provide service."

¶ 78    Upon review of the Ameren Illinois cases, we agree none show the Commission addressed section 9-211 in this context. In fact, in the earlier three cases, none show the argument was even raised. See *Commonwealth Edison Co.*, 224 P.U.R.4th 357, 2003 Ill. PUC LEXIS 311, at *111 (Mar. 28, 2003). In *Commonwealth Edison Co.*, Ill. Comm. Comm'n No. 01-0423, the Commission approved a *pro forma* adjustment, but it rejected a proposed depreciation reserve adjustment upon concluding such an adjustment would improperly shift the test year. See *Commonwealth Edison Co.*, 224 P.U.R.4th 357, 2003 Ill. PUC LEXIS 311, at *112 (Mar. 28, 2003); *Commonwealth Edison Co.*, 250 P.U.R.4th 161, 2006 Ill. PUC LEXIS 43, at *33 (July 26, 2006); *North Shore Gas Co./Peoples Gas Light & Coke Co.*, Ill. Comm. Comm'n Nos. 07-0241, 07-0242 cons., http://www.icc.illinois.gov/docket/files.aspx?no=07-0241&docId=119858 (Final Order Feb. 8, 2008). Thus, it is not evident in those cases the Commission even considered section 9-

211 when stating it would not apply post-test-year accumulated depreciation from the embedded rate base when adjusting the rate base for post-test-year *pro forma* capital adjustments. In the latter *ComEd* decision before the Commission, intervenors raised the argument, but the Commission did not address it in its conclusion. Instead, the Commission focused on the holdings of the previous decisions and followed those. *Commonwealth Edison*, Ill. Comm. Comm'n No. 07-0566 at 22, 28-30, http://www.icc.illinois.gov/docket/files.aspx?no=07-0566&docId=128596 (Final Order Sept. 10, 2008). Interestingly, the Commission stated it would make "an about face with regard to its prior decisions" when there is "a clear showing as to the appropriateness of such a change by way of proper evidentiary and legal support for us to consider such departures from settled precedent." *Id.* at 30.

¶ 79    Here, the Commission cites new legal authority, in addition to evidence of a significantly overstated rate base in violation of such authority. In light of the fact the Commission addressed arguments not addressed before, the Commission's decision is not arbitrary.

¶ 80    Second, although the Commission in its brief concedes it "may have been in the process of making a change in rate regulation in the present case as a matter of policy," we are not convinced (1) a change in policy exists, (2) the Commission's action violates section 10-101, or (3) *BPI I* and *BPI II* mandates reversal.

¶ 81    A plain reading of section 10-101 of the Public Utilities Act does not establish it applies here. Ameren Illinois emphasizes the following language in section 10-101:

> "Any proceeding intended to lead to the establishment of policies, practices, rules or programs applicable to more than one utility may, in the Commission's discretion, be conducted pursuant to either rulemaking or contested case provisions, provided such choice is clearly indicated at the beginning of such proceeding and subsequently adhered to." 220 ILCS 5/10-101 (West 2008).

¶ 82    Section 10-101 does not explicitly require the Commission, when considering a new legal argument, *e.g.*, whether a statute requires a change in a "policy," to hold a proceeding before resolving the argument. In addition, the rate case itself is not a "proceeding intended to lead to the establishment of policies, practices, rules or programs applicable to more than one utility," and the Commission has discretion whether to hold a proceeding.

¶ 83    Moreover, *BPI I* and *BPI II* also do not establish section 10-101 applies, as both are distinguishable and not controlling. In these cases, the practice that was abandoned by the Commission had been created by the Commission and abandoned without any reliance on statute or other authority. See *BPI I*, 136 Ill. 2d at 219, 555 N.E.2d at 705. In *BPI I*, the intervenors argued the Commission, in setting rates over a five-year period for a utility, violated its past practice of setting rates on a year-to-year basis. *BPI I*, 136 Ill. 2d at 219, 555 N.E.2d at 705. In considering the intervenors' claims, the supreme court noted the Commission created, in General Order 210 (83 Ill. Adm. Code 285.150 (1985)), a single test year by which revenues and expenses could be more accurately determined. *BPI I*, 136 Ill. 2d at 219, 555 N.E.2d at 705. Despite General Order 210, however, the Commission, in *BPI I*, without announcing a rule change, considered a five-year test range when creating the order for a five-year moratorium. *BPI I*, 136 Ill. 2d at 225-26, 555 N.E.2d at 708. The

Commission notably did not consider, as here, whether its existing policy or practice ran afoul of statutory law. The supreme court ruled the Commission had improperly altered and amended its own rules without following the procedures of section 10-101. *BPI I*, 136 Ill. 2d at 226-27, 555 N.E.2d at 708-09; see also *BPI II*, 146 Ill. 2d at 240-41, 585 N.E.2d at 1060.

¶ 84    In this case, the Commission did not amend its practice or policy on its own volition. The Commission, instead, relied on a legal argument the record shows had not been addressed before as well as on recent facts to determine a statute would be violated if its current practice continued. The Commission has "the authority to address each matter before it freely, even if it involves issues identical to a previous case." *Lakehead Pipeline Co.*, 296 Ill. App. 3d at 956, 696 N.E.2d at 354. The *BPI* decisions do not establish section 10-101 applies in such circumstances.

¶ 85             2. *The Commission's Interpretation of Section 9-211 Is Proper*

¶ 86    Section 9-211 of the Public Utilities Act (220 ILCS 5/9-211 (West 2010)) provides the following:

> "The Commission, in any determination of rates or charges, shall include in a utility's rate base only the value of such investment which is both prudently incurred and used and useful in providing service to public utility customers."

¶ 87    Ameren Illinois argues the Commission's decision is unlawful because the Commission erroneously interpreted section 9-211 of the Public Utilities Act. Ameren Illinois maintains the Commission, as well as the Second District, improperly added words to the section. Both the Commission, in its April 2010, order and the Second District found the following: "Section 9-211 essentially requires the Commission to ensure that a utility's approved rate base does not exceed the investment value that the utility actually uses to provide service." *Commonwealth Edison*, 405 Ill. App. 3d at 405, 937 N.E.2d at 703. Ameren Illinois maintains section 9-211 does not say anything about "investment value" or dictate a standard the Commission should apply to value investments included in rate base. Instead, Ameren Illinois argues the plain language of section 9-211 is to limit cost recovery to only those investments that are "both prudently incurred and used and useful in providing service" (220 ILCS 5/9-211 (West 2010)).

¶ 88    We first address the appropriate standard of review for this argument. Section 9-211 is a statute the Commission is charged with administering and enforcing. We therefore give the Commission's interpretation of the statute substantial weight and deference. See *Birkett*, 202 Ill. 2d at 46, 779 N.E.2d at 881. We note less deference is given when the Commission's decision is a departure from past practice. *BPI I*, 136 Ill. 2d at 228, 555 N.E.2d at 709. No party, however, has established less deference should be afforded here as none has contradicted the Commission's April 2010 conclusion the Commission had not addressed section 9-211 in this context before.

¶ 89    Applying the deferential standard of review, we find no error in the Commission's interpretation of section 9-211. First, contrary to Ameren Illinois's argument section 9-211 mentions investment value: "The Commission, in any determination of rates or charges, shall include in a utility's rate base only the *value of such investment* which is both prudently

-16-

incurred and used and useful in providing service to public utility customers." (Emphasis added.) 220 ILCS 5/9-211 (West 2010). To read the statute as Ameren Illinois suggests requires us to ignore the "value of such investment" words, something this court may not do. See *Cassens Transport Co. v. Illinois Industrial Comm'n*, 218 Ill. 2d 519, 524, 844 N.E.2d 414, 419 (2006) (holding a court "must construe the statute so that each word, clause, and sentence is given a reasonable meaning"). Second, the rate base is a utility's "invested capital." See *Citizens Utilities*, 124 Ill. 2d at 200, 529 N.E.2d at 512. If each investment complies with section 9-211, it follows the rate base will as well; *i.e*, the rate base will not exceed the value of investments used to provide service. We find no error in the Commission's interpretation of section 9-211 as the rate base did not exceed the investment value the utility uses to provide service.

¶ 90    Our decision is supported by the Second District's decision in *Commonwealth Edison*. In that case, the Second District found, as the Commission did here, section 9-211 "essentially requires the Commission to ensure that a utility's approved rate base does not exceed the investment value that the utility actually uses to provide service." *Commonwealth Edison*, 405 Ill. App. 3d at 405, 937 N.E.2d at 703. The Second District concluded the Commission's approval of a base rate that included a post-test-year *pro forma* adjustment but did not include a corresponding post-test-year adjustment for accumulated depreciation violated section 9-211 because its value was inflated. *Commonwealth Edison*, 405 Ill. App. 3d at 405, 937 N.E.2d at 703.

¶ 91             3. *The Commission Lawfully Found ADR and ADIT Adjustments*
                *Were Consistent With the Public Utilities Act or Section 287.40*
                          *of Title 83 of the Administrative Code*

¶ 92    Ameren Illinois makes three arguments supporting its claim the Commission unlawfully and unreasonably concluded the ADR and ADIT adjustments were consistent with the Public Utilities Act and section 287.40 of title 83 of the Administrative Code. First, Ameren Illinois, citing *BPI I*, contends the Commission cannot circumvent its own rules by moving the test year to the end of the *pro forma* period. Second, Ameren Illinois maintains the Commission's ADR and ADIT adjustments are impermissible adjustments based solely on attrition factors. Third, Ameren Illinois argues the "roll forward" ADR and ADIT adjustments prevent it from recovering its prudent cost of service.

¶ 93    IIEC and the Commission contend Ameren Illinois's arguments are based on the supposition section 287.40 of title 83 of the Administrative Code is meant only to favor utilities by increasing rate base. Both maintain section 287.40 allows for ADIT and ADR adjustments because both adjustments in this case were known and measurable changes in plant investment through the post-test-year period allowed for *pro forma* capital adjustments. These parties also maintain ADR and ADIT adjustments are not attrition, and Ameren Illinois's latter argument is simply a complaint its own witnesses' testimony should have been accepted over the testimony of the other parties' witnesses.

¶ 94    Two provisions of the Administrative Code are relevant to Ameren Illinois's argument: sections 287.20 and 287.40 of title 83. Section 287.20 sets forth the test-year requirements:

"A utility, at its option, may propose either one of the following periods as its proposed test year:

(a) Historical. Any consecutive 12[-]month period, beginning no more than 24 months prior to the date of the utility's filing, for which actual data are available at the time of filing new tariffs; or

(b) Future. Any consecutive 12[-]month period of forecasted data beginning no earlier than the date new tariffs are filed and ending no later than 24 months after the date new tariffs are filed." 83 Ill. Adm. Code 287.20 (2011), adopted at 27 Ill. Reg. 12380, 12382 (eff. Aug. 1, 2003).

The test-year rule's purpose "is to prevent a utility from overstating its revenue requirement by mismatching low revenue data from one year with high expense data from a different year." *BPI II*, 146 Ill. 2d at 238, 585 N.E.2d at 1058.

¶ 95 Section 287.40 of title 83 of the Administrative Code allows for *pro forma* adjustments in a post-test-year period:

"A utility may propose pro forma adjustments (estimated or calculated adjustments made in the same context and format in which the affected information was provided) to the selected historical test year for all known and measurable changes in the operating results of the test year. These adjustments shall reflect changes affecting the ratepayers in plant investment, operating revenues, expenses, and cost of capital where such changes occurred during the selected historical test year or are reasonably certain to occur subsequent to the historical test year within 12 months after the filing date of the tariffs and where the amounts of the changes are determinable. Attrition or inflation factors shall not be substituted for a specific study of individual capital, revenue, and expense components." 83 Ill. Adm. Code 287.40 (2011), adopted at 27 Ill. Reg. 12380, 12384 (eff. Aug. 1, 2003).

¶ 96 Ameren Illinois argues section 287.40 does not abolish the concept of a 12-month test period, but the Commission's "roll forward" of the balances of ADR and ADIT to the end of the *pro forma* period does. Ameren Illinois contends the decision to "roll forward" the balances of ADR and ADIT an additional 14 months resulted in an improper extension of the test year. Ameren Illinois also maintains it had the right under section 287.40 to propose an adjustment to the test-year plant and the Commission arbitrarily moved the test year because Ameren Illinois exercised those rights.

¶ 97 We disagree with Ameren Illinois's conclusions. The "roll forward" of ADR and ADIT balances does not offend the test-year requirements of section 287.20. The purpose of the test-year requirements is to insure the revenue and expenses match. See *BPI II*, 146 Ill. 2d at 238, 585 N.E.2d at 1058. A *pro forma* adjustment as Ameren Illinois proposes is, as the Commission concluded, "not consistent with any reading of the Commission's test[-]year rules that is also consistent with the limitations of section 9-211 of the [Public Utilities] Act." Suggesting it can pick and choose which *pro forma* adjustments to propose, while intervenors are not allowed to show how such *pro forma* adjustments will inflate base rate and to show what other *pro forma* adjustments are appropriate, contradicts such purpose.

¶ 98 While Ameren Illinois has the right to propose *pro forma* adjustments, such adjustments

must "reflect *changes affecting the ratepayers* in plant investment, operating revenues, expenses, and cost of capital." (Emphasis added.) 83 Ill. Adm. Code 287.40 (2011). We agree with the Second District's conclusion this language establishes an increase in ADR and ADIT during the post-test-year period is a change affecting ratepayers and must be factored into the rate base. See *Commonwealth Edison*, 405 Ill. App. 3d at 406, 937 N.E.2d at 703. This interpretation is consistent with the interpretation by the Commission and the Second District that section 9-211 requires the rate base does not exceed the investment value a utility actually uses to provide utility services (see *Commonwealth Edison*, 405 Ill. App. 3d at 405, 937 N.E.2d at 704). Section 9-211 cannot be satisfied if a utility is allowed to select which *pro forma* adjustments apply but intervenors are denied the opportunity to establish why such adjustments are inflated or propose additional *pro forma* adjustments.

¶ 99 Ameren Illinois next argues the Commission is not permitted under section 287.40 to approve *pro forma* adjustments based solely on attrition factors. Ameren Illinois contends if inflation cannot increase base rate, attrition may not decrease base rate. Ameren Illinois further maintains although ADR and ADIT balances may increase during the *pro forma* period, this does not mean the adjustments are based on the type of specific study section 287.40 requires.

¶ 100 IIEC argues the *pro forma* adjustments for ADR and ADIT are not based on attrition as the Commission defines the term. IIEC, citing a 1982 decision, argues the Commission has described attrition as "primarily the result of the effect of inflation on operating expenses and rate base, the loss of margin from declining sales volumes, and increases in the cost of capital as a consequence of the rising cost of senior securities." *Peoples Gas Light & Coke Co.*, No. 82-0082, 1982 Ill. PUC LEXIS 1, at *29 (Ill. Comm. Comm'n Dec., 28, 1982). IIEC further contends these adjustments are not attrition, as they are made according to schedules prescribed by the Commission, are certain to occur, and are known and measurable.

¶ 101 We deem this argument forfeited. Ameren Illinois cites no decision or order interpreting the meaning of attrition or establishing ADR and ADIT are attrition. Ameren Illinois cites one case, *Iowa-Illinois Gas & Electric Co.*, 1993 Ill. PUC LEXIS 245, at *55-57 (Ill. Comm. Comm'n July 21, 1993), in which the Commission determined the utility had applied "a judgmental inflation factor without the particularized study required." This decision does not provide any help in determining how the Commission would define attrition and whether attrition was improperly attributed in this case. It, and thus Ameren Illinois, falls far short of establishing the ADR and ADIT balances during the *pro forma* adjustment period are the result of attrition. See Ill. S. Ct. R. 341(h)(7) (eff. July 1, 2008) ("Points not argued are waived ***."); *Elder v. Bryant*, 324 Ill. App. 3d 526, 533, 755 N.E.2d 515, 522 (2001) ("Allegations of trial court error summarily raised without supporting authority are deficient and warrant a finding of waiver.").

¶ 102 We also note IIEC's argument does not cure Ameren Illinois's error. IIEC incorrectly attributes the above attrition definition to the Commission. In that case, the attrition definition was provided by the utility, not the Commission. See *Peoples Gas Light & Coke Co.*, No. 82-0082, 1982 Ill. PUC LEXIS 1, at *29 (Ill. Comm. Comm'n Dec. 28, 1992) ("Respondent's witness testified that, for Respondent, attrition is primarily the result of the effect of inflation on operating expenses ***.").

¶ 103   Ameren Illinois further argues the Commission's "roll forward" adjustment prevents it from recovering its prudent cost of service, which it is allowed to do under *Citizens Utilities Board*, 166 Ill. 2d at 121-22, 651 N.E.2d at 1095. Ameren Illinois contends if the alleged purpose of the "roll forward" is to create an accurate snapshot of the net plant at the time of service, that purpose has failed. Ameren Illinois contends the Commission failed to depict an accurate picture of its net plant as of February 2010 because Ameren Illinois's proposed *pro forma* plant addition adjustment ($278 million) to rate base did not include all capital additions actually placed in service during the *pro forma* period ($380 million). The inequality that results when all depreciation is reflected but not all new investment will be added demonstrates, according to Ameren Illinois, the Commission should not "roll forward" the full amount of the increases for ADR and ADIT for all existing plants.

¶ 104   This argument does not establish section 287.40 of title 83 of the Administrative Code and section 9-211 of the Public Utilities Act should not be interpreted to allow post-test-year adjustments for ADR and ADIT. As IIEC points out, Ameren Illinois does not contend the $102 million in actual capital additions not included in *pro forma* adjustments would or should have satisfied section 287.40 requirements, such as the requirement *pro forma* adjustments be known and measurable. Ameren Illinois also has not argued this inequality could not have been avoided either by its having chosen a different test year or by better anticipating known and measurable capital additions. We are not convinced this alleged inequity is caused by the misinterpretation of section 287.40 and section 9-211. It seems a greater inequality would result as to the true value of a rate base if a *pro forma* adjustment of $278 million would have been allowed to inflate rate base, without a corresponding *pro forma* adjustment of known and measurable factors decreasing rate base.


¶ 105        4. *The Commission's Adjustments Are Supported by Substantial Evidence*

¶ 106        a. The Evidence Supports a "Roll Forward" Adjustment of ADR and ADIT

¶ 107   Ameren Illinois first maintains the evidence presented does not support a "roll forward" adjustment of ADR and ADIT. Ameren Illinois contends the "matching principle" is violated by the rolling forward of these adjustments. Ameren Illinois begins this argument by revisiting the argument the test rules should not be circumvented by applying the ADR and ADIT *pro forma* adjustments. We need not revisit it. Ameren Illinois, citing staff, further argues strict adherence to the matching principle requires the alignment of all components of the revenue requirement, including service costs and rate-of-return information.

¶ 108   Without any citation to authority, Ameren Illinois also contends the goal of a *pro forma* plant adjustment is not to determine what a utility's actual net plant will be at some point but to allow the utility to "recover prospective investment in rate base and therefore mitigate regulatory lag." In addition, Ameren Illinois urges this court not to follow the Second District's decision in *Commonwealth Edison*, arguing the Second District improperly stood in the shoes of the Commission and rejected an established policy on its own judgment.

¶ 109   These arguments fail. First, Ameren Illinois fails to cite any authority supporting its claim the purpose of section 287.40 is to mitigate regulatory lag. This argument is therefore forfeited. Ill. S. Ct. R. 341(h)(7) (eff. July 1, 2008) ("Points not argued are waived ***.").

Second, Ameren Illinois's urging this court to disregard *Commonwealth Edison* as an improper exercise of deference fails. Whether the Second District was correct is not the question before this court. It is thus irrelevant whether the Second District should have been deferential to the Commission in its case and upheld the practice of not including post-test-year ADR and ADIT. This case comes to us on the decision of the Commission, interpreting section 9-211 and section 287.40, together, as requiring the adjustments. As we determined above, we are required to give the Commission's decision deference as it was interpreting a statute and rule it was to enforce. See *Birkett*, 202 Ill. 2d at 46, 779 N.E.2d at 881. Applying this deference, we found no error in those interpretations. While we have found the Second District's decision supports our deferential finding, it is not within our province to determine if the Second District was correct.

¶ 110      We turn back to Ameren Illinois's matching-principle argument. In its November 2010 order on rehearing, the Commission concluded the matching principle is not violated by applying *pro forma* adjustments proposed by the intervenors and the *pro forma* adjustment proposed by Ameren Illinois. The Commission, observing one could argue any *pro forma* adjustment violates the matching principle, found its adoption of the proposed *pro forma* adjustments of Ameren Illinois and those of the intervenors was consistent with the matching principle because it resulted in a rate-base value reflecting "both increases and decreases at a consistent point in time."

¶ 111      Ameren Illinois asserts the decision to "roll forward" ADR and ADIT is not supported by substantial evidence. " 'Substantial evidence' has been defined as evidence which a reasoning mind would accept as sufficient to support a particular conclusion and consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Central Illinois Public Service Co.*, 268 Ill. App. 3d at 479, 644 N.E.2d at 823. "[A] reviewing court must not put itself in the place of the Commission and conduct an independent investigation, nor should it substitute its judgment for that of the Commission." *Central Illinois Public Service Co.*, 268 Ill. App. 3d at 479, 644 N.E.2d at 823. " 'Merely showing that the evidence presented would support a different conclusion than the one reached by the Commission is not sufficient. Rather, the appellant must affirmatively demonstrate that the opposite conclusion is 'clearly evident.' " *Illinois Power Co. v. Illinois Commerce Comm'n*, 382 Ill. App. 3d 195, 201, 887 N.E.2d 678, 683 (2008).

¶ 112      We find substantial evidence supports the Commission's decision. Ameren Illinois proposed a *pro forma* capital addition of $280 million. The record contains evidence showing the rate base would have exceeded the investment value as of the end of February 2010, the date of the *pro forma* adjustment, had no adjustments for ADR and ADIT been made. We do not find such adjustments under section 287.40 of title 83 of the Administrative Code violate the matching principle.

¶ 113      Ameren Illinois next argues the evidence shows an automatic "roll forward" exacerbates regulatory lag and eviscerates the purpose of *pro forma* adjustments. In support, Ameren Illinois cites evidence showing the Commission's "roll forward" adjustments cut against the purpose of *pro forma* adjustments as they fail to establish a level of plant investment that actually exists when new rates are in effect. In addition, Ameren Illinois disputes the contention that the ADR and ADIT balance adjustments are necessary to prevent Ameren

-21-

Illinois from overearning its authorized rate of return. Ameren Illinois contends the utilities in the above-cited rate cases did not overearn, despite the Commission's refusal to make post-test-year ADR and ADIT adjustments, as shown by the fact those utilities all seek another rate increase.

¶ 114    We do not find these arguments convincing. Again, we note Ameren Illinois has not provided authority for its argument the purpose of section 287.40 is to mitigate regulatory lag. This argument is forfeited.

¶ 115    Moreover, the fact the *pro forma* adjustments for ADR and ADIT and the addition of the *pro forma* adjustment Ameren Illinois proposed do not establish a level of plant investment that actually exists when the rates are in effect does not mean substantial evidence does not support the Commission's decision. As the Commission's November 2010 order on rehearing shows, the utility bears some of the responsibility for the mismatch of these amounts: "Had [Ameren Illinois] more accurately estimated its plant additions for the period, *pro forma* plant additions would more closely resemble its actual plant additions."

¶ 116    We further find unconvincing the simple fact rate cases have been filed in the above-referenced cases as evidence those utilities did not overearn based on the fact adjustments were not made for post-test-year ADR and ADIT balances. The potential reasons for the proposed rate increases are myriad. Any reliance on the mere fact rate increases have been requested as proof ADR and ADIT adjustments are unnecessary to prevent inflated rate bases is pure speculation.

¶ 117    b. The Commission's Method in Applying the Adjustments to ADR and ADIT

Is Supported by Substantial Evidence

¶ 118                    i. *Ameren Illinois's Argument*

¶ 119    Ameren Illinois challenges the Commission's decision by arguing the Commission ignored (1) the differing assumptions and flaws underlying the parties' various proposed adjustments and (2) material evidence presented on rehearing that weighed against making the specific adjustment. Regarding its first argument, Ameren Illinois cites the April 2010 order in which the Commission anticipated its interpretation of section 287.40 " 'may allow for a situation where a utility's gross plant increase would be outpaced by its additional accumulated depreciation.' " Such a situation, according to Ameren Illinois, resulted for one of its utilities to have a decreased rate base "net plant" even when that utility shows a trend of increasing actual net plant over the same period. Ameren Illinois also cites a staff recommendation for a "limited projects" test, when a post-test-year adjustment to ADR is appropriate. The staff recommended test-year balances of ADR and ADIT would not be rolled forward if the utility's proposed *pro forma* adjustment to plant was less than substantial in comparison to projects expected to be in service during the *pro forma* period. Ameren Illinois contends this approach would lead to another paradox: a utility would receive a larger rate-base increase by recognizing some, but not most, of its *pro forma* capital additions.

¶ 120    Ameren Illinois concludes this argument by maintaining the various "roll forward" adjustments proposed differed in methodology and amount and demonstrate the uncertainty

for when such adjustments should be applied and calculated.

¶ 121 Ameren Illinois last contends the Commission ignored material evidence against making the specific adjustment. Ameren Illinois argues if the ADR and ADIT for embedded plant were within the Commission's discretion, the methodology used should have resulted in a "net plant" and rate base that accurately depict the investment value the utility uses to provide service. Ameren Illinois contends the methodology did not. Ameren Illinois argues it is uncontested it invested more capital than what was included in the rate base as *pro forma* adjustments. Ameren Illinois argues, assuming ADR-ADIT are inseverable from *pro forma* capital adjustments, "any proper measure of the *pro forma* adjustments to ADR and ADIT would have to account for the amount of plant additions included in adjustment." Ameren Illinois argues the proper match would have been "to deduct only a percentage of the increases to accumulated depreciation and ADIT based on the ratio of pro forma plant additions to the total plant placed in service during the pro forma period." Despite the Commission's conclusion it may not often have actual values for plant additions during other *pro forma* periods, Ameren Illinois argues the Commission should not disregard such evidence if it is available on rehearing.

¶ 122 Ameren Illinois asks this court, at a minimum, to remand the case so the Commission may determine what portion of the estimated *pro forma* period increase to ADR and ADIT should be added to rate base.

¶ 123                 ii. *The Commission's Argument*

¶ 124 The Commission contends its decision is supported by adjustments set forth in schedules and appendices in the record. The Commission maintains the accumulated-depreciation calculation found by the Commission is supported by staff evidence. The Commission further maintains it did not improperly ignore evidence of actual gross plant during the *pro forma* period, concluding instead such evidence to update *pro forma* adjustments under section 287.40 is improper on rehearing.

¶ 125                 iii. *IIEC's Argument*

¶ 126 IIEC contends the Commission independently and appropriately determined the post-test-year rate base adjustment. IIEC, citing *People ex rel. Hartigan v. Illinois Commerce Comm'n*, 117 Ill. 2d 120, 135, 510 N.E.2d 865, 871 (1987), also contends the Commission is to be an active participant in rate-making proceedings and must, under section 9-201(c) of the Public Utilities Act (220 ILCS 5/9-201(c) (West 2008)), determine just and reasonable rates. IIEC maintains the Commission's decision is supported by the record, is explained fully, and is a legitimate application of the Commission's expertise.

¶ 127 IIEC also maintains the Commission did not commit reversible error when it ignored Ameren Illinois's actual data presented on rehearing. IIEC emphasizes Ameren Illinois proposed a historical test year. The actual information provided by Ameren Illinois occurred outside the test year and was not presented to the Commission under section 287.40 as a *pro forma* adjustment. Under the Commission's test-year rules, according to the IIEC, Ameren Illinois's actual data is not permissible.

¶ 128                    iv. *Conclusion*

¶ 129    Having reviewed the parties' arguments and the record, we find Ameren Illinois has failed to establish affirmatively the opposite conclusion is " 'clearly evident.' " *Illinois Power Co.*, 382 Ill. App. 3d at 201, 887 N.E.2d at 683. We are not convinced the mere fact other scenarios may not permit the application of ADR and ADIT *pro forma* adjustments in the manner presented here undermines the conclusion of the Commission to apply those adjustments as it did. These scenarios show instances where a utility may choose not to seek *pro forma* adjustment, but do not in this case show the Commission's decision lacked substantial evidence. As IIEC and the Commission argue, the record contains evidence supporting the Commission's decision regarding the calculations underlying the rate base. Ameren Illinois does not challenge the numbers, arguing instead the ADR and ADIT adjustments should not apply at all.

¶ 130    In addition, we find Ameren Illinois has not shown the Commission's decision not to consider evidence of capital adjustments occurring post-test year but not sought to be considered as a *pro forma* adjustment under section 287.40 was unreasonable. See 220 ILCS 5/10-201(d) (West 2008) ("[O]rders or decisions of the Commission shall be held to be prima facie reasonable ***."). This holding is consistent with the test-year (section 287.20) and *pro forma* adjustment (section 287.40) rules. In addition, the Commission's conclusion Ameren Illinois could have better estimated its *pro forma* adjustments and prevented this scenario from occurring is not unreasonable. It is not difficult to foresee the procedural nightmare that would result if utilities are permitted the opportunity to continue to seek changes to rate base after the first order is entered and during the rehearing proceedings.


¶ 131                    C. The Revenue Act Tax

¶ 132           1. *The Commission Lawfully Allocated Ameren Illinois's*
                       *Revenue Act Tax Expense*

¶ 133                    a. IIEC Argument

¶ 134    IIEC contends the Commission's decision to allocate the Revenue Act tax exclusively on the basis of kWh delivered is unlawful. IIEC begins by citing section 16-108(c) of the Public Utilities Act (220 ILCS 5/16-108(c) (West 2008)), which requires "[c]harges for delivery services shall be cost based." IIEC highlights the following language in the April 2010 order, which also indicates the Commission should assign tax costs to the cost causers:

> "[T]he Commission recognizes that allocation of the [Revenue Act] tax among the electric rate classes involves millions of dollars. Properly assigning these tax costs *to the cost causers* is clearly important to both customers and the Commission. What drives these tax costs, however, is not entirely clear." (Emphasis added in IIEC brief.)

¶ 135    IIEC then, citing the June 2010 notice that stated the Revenue Act tax would be treated as a pass-through tax, argues this treatment of Ameren Illinois's Revenue Act tax expense as a pass-through tax violates the Commission's cost-causation policy. IIEC states the record shows that almost 84% of Ameren Illinois's Revenue Act tax expense is attributable to Ameren Illinois's historical plant in service. According to IIEC, although the revised

Revenue Act tax calculation used different terms, the purpose of the tax was to maintain utilities' invested capital-tax liabilities at the 1997 plant-in-service levels.

¶ 136    IIEC argues in the 2008 test year, Ameren Illinois paid $170 million in Revenue Act tax, and about 77% of that expense was a function of Ameren Illinois's 1997 invested capital tax payment–a function of Ameren Illinois's 1997 plant in service. IIEC contends only $39.1 million of that expense was unrelated to Ameren Illinois's 1997 invested capital tax. IIEC argues even this portion is only due in part to increases in kWh deliveries, as the remaining portion is due to statewide caps, inflation measures, and tax payments by other utilities. IIEC emphasizes evidence it presented shows changes in Ameren Illinois's kWh deliveries had only a weak explanatory value for changes in the utility's Revenue Act tax.

¶ 137    IIEC concludes this argument by maintaining because the unrefuted record evidence shows Ameren Illinois's kWh deliveries affect less than 25% of the Revenue Act tax expense, the Commission's decision to allocate the entirety of the tax expense exclusively on the basis of kWh delivered was not supported by substantial evidence. According to IIEC, the Commission improperly used the legislative tax calculation instead of relying on evidence.

¶ 138    IIEC also argues the Commission improperly relied on "[t]he disconnect between plant in service and the [Revenue Act tax] apparent from the fact that as the level of a utility's plant increases or decreases, that specific change would have no impact on the utility's distribution tax," while ignoring the disconnect between Revenue Act tax expense and Ameren Illinois's kWh deliveries. IIEC maintains Ameren Illinois's 1997 plant-in-service amount is fixed and is embedded in the Revenue Act tax expense Ameren Illinois incurs. IIEC maintains the Commission erred in changing how the Revenue Act tax liability is allocated among customers.

¶ 139    IIEC further maintains the Commission's decision improperly rests on its misapprehension of the legal effect of the 1997 revisions. IIEC argues the Commission properly concluded in its April 2010 order "the statutory language does not expressly direct that the manner in which the tax is allocated be changed." IIEC contends the Commission's decision to use kWh delivery for the basis for the Revenue Act tax expense disturbs its unique rate-making authority, as the Public Utilities Act requires cost-based rates and cost allocations based on causation. The Commission, according to IIEC, should have continued to use the plant-in-service allocator or "the more refined dual factor allocation of [Revenue Act] tax expense" proposed by IIEC and rejected the proposal to allocate Revenue Act tax based exclusively on kWh delivered.

¶ 140                              b. The Commission's Argument

¶ 141    The Commission argues its decision to recover the Revenue Act tax on a kWh basis is lawful and supported by the evidence. The Commission maintains Public Act 90-561, effective January 1, 1998, fundamentally changed the regulation of electric public utilities. The Commission argues evidence shows while the General Assembly wanted to maintain the total amount of revenue the previous provisions provided, the current Revenue Act tax had "nothing to do with plant investment." See Pub. Act 90-561 (eff. Jan. 1, 1998) (amending

35 ILCS 620/1a (West 1996) ("[T]his amendatory Act of 1997 is intended to provide for a replacement for the invested capital tax on electric utilities *** and replace it with a new tax based on the quantity of electricity that is delivered in this State." (1997 Ill. Laws 6195, 6304)).

¶ 142    The Commission emphasizes shortly after the Revenue Act revisions took effect, it approved allocating the Revenue Act tax on a kWh basis for ComEd in 1999. See *In re Commonwealth Edison Co.*, No. 99-0117, 1999 WL 1016974, at *31-*32 (Ill. Comm. Comm'n Aug. 26, 1999). The predecessors of Ameren Illinois had not altered their method of assigning tax liability to their customers. As a result, according to the Commission, evidence shows significant cross-subsidization had taken place. DS-4 customers received 43% of the kWh taxed but were assessed only 8% of the Revenue Act tax. Residential customers received 30% of the kWh taxed but were assessed 56% of the Revenue Act tax.

¶ 143                                    c. Ameren Illinois's Argument

¶ 144    Ameren Illinois begins by reminding this court the Commission's decisions are *prima facie* reasonable. See 220 ILCS 5/10-201(d) (West 2008). Ameren Illinois contends IIEC's claims miss the mark. Ameren Illinois points to the language in the amendatory act and states it was meant to preserve the same level of tax revenue, not to preserve the same basis for the tax. Ameren Illinois contends what former factors caused the tax is irrelevant; new factors maintain the tax.

¶ 145    Ameren Illinois also argues the Commission had not abandoned its rate-making authority, but had the Commission ignored the new basis for the Revenue Act tax, it would have done so arbitrarily. Ameren Illinois contends IIEC admits it is the interpretation of the effect of the amendatory act, not the language of the statute itself, that matters. Ameren Illinois further contends because this is an application of the law, the *de novo* review does not apply. According to Ameren Illinois, it does not matter what standard of review applies, because the General Assembly stated its legislative intent in the Revenue Act itself. Ameren Illinois concludes because "the tax is *assessed* on kWh sales, it makes sense to also *allocate* that cost based on kWh sales." (Emphasis in original.)

¶ 146                                    d. Conclusion

¶ 147    Rate design, because of its complexity, "is uniquely a matter for the Commission's discretion." *Central Illinois Public Service Co. v. Illinois Commerce Comm'n*, 243 Ill. App. 3d 421, 446, 610 N.E.2d 1356, 1373 (1993). Decisions of the Commission are *prima facie* reasonable. 220 ILCS 5/10-201(d) (West 2008).

¶ 148    In formulating the rate design for this case, the Commission considered the effect of a change in the Revenue Act. Section 2a.1 of the Revenue Act imposes a tax upon a utility based on the amount of kWh distributed by that utility during the taxable period. 35 ILCS 620/2a.1 (West 2008). In section 1a of the Revenue Act, the General Assembly set forth its "Legislative Intent" in creating the Revenue Act tax:

"The General Assembly previously imposed a tax on the invested capital of electric

utilities to replace in part the personal property tax that was abolished by the Illinois Constitution of 1970. Subsequent to the enactment and imposition of the invested capital tax on electric utilities, State and federal laws regulating the provision of electricity have been enacted which provide for the restructuring of the electric power industry into a competitive industry. In response to this restructuring, this amendatory Act of 1997 is intended to provide for a replacement for the invested capital tax on electric utilities, other than electric cooperatives, and replace it with a new tax based on the quantity of electricity that is delivered in this State. The General Assembly finds and declares that this new tax is a fairer and more equitable means to replace that portion of the personal property tax that was abolished ***." 35 ILCS 620/1a (West 2008).

¶ 149 The legislative intent cannot be clearer. Contrary to IIEC's argument, the legislature did not intend that plant-in-service control. The legislature intended to "replace" the invested capital tax, not "modify" it. The legislature refers to the kWh-based tax as "a new tax" that is "a fairer and more equitable means to replace" the abolished personal property tax. 35 ILCS 620/1a (West 2008). No reading of section 1a permits the conclusion the legislature intended invested capital remain part of the analysis.

¶ 150 As all parties acknowledge, neither section 1a nor 2a.1 of the Revenue Act explicitly directs the Commission how to allocate a utility's Revenue Act tax expense among customers. The issue then becomes whether the Commission's decision in setting the rate design, in which it decided to allocate the Revenue Act tax by the same means (based on distributed kWh) it is assessed on the utility, violates the Public Utilities Act's direction that charges for delivery services shall be cost-based (220 ILCS 5/16-108(c) (West 2008)). We hold it does not.

¶ 151 In rejecting IIEC's contention 1997 invested capital or plant in service, not kWh, is the primary cost causer, the Commission effectively held kWh distributed determines a utility's Revenue Act tax cost. This interpretation is consistent with the plain language in section 1a of the Revenue Act (35 ILCS 620/1a (West 2008)) and in section 2a.1, itself, which imposes a tax based on the amount of kWh distributed (35 ILCS 620/2a.1 (West 2008)). The record shows the legislature desired invested capital be removed from the equation because public utilities were shedding much of its plant in service and the new kWh-based tax would insure revenue regardless of the plant in service. Allocating Revenue Act tax liability the same way the liability is assessed is consistent with the Revenue Act and the Public Utilities Act.

¶ 152 　　　　　　　　　2. *The November 2010 Order Contains Sufficient*
*Findings and Conclusions for Appellate Review*

¶ 153 IIEC argues the November 2010 order does not contain findings and conclusions adequate to allow for informed judicial review of its decision "re-interpreting" the April 2010 order to permit the removal of the Revenue Act tax from base rates and allow recovery of such tax as a pass-through tax.

¶ 154 IIEC points to the language in the April 2010 order that specifies the Revenue Act tax expense should be recovered in base rates through existing base-rate charges for rate classes DS-1, DS-2, and DS-5 and through a new base rate per kWh charge for classes DS-3 and DS-

4. IIEC claims despite such language, the Commission "summarily reversed its position," stating it had intended to remove the Revenue Act tax expense from base rates and treat it as a pass-through tax. In this reversal, the Commission, according to the IIEC, did not include any findings or analysis to support this about-face.

¶ 155   The Commission argues IIEC's contention lacks merit. The Commission maintains IIEC is attempting to use an ambiguity in the April 2010 order as a means to overturn the Commission's decision. In support, the Commission notes, contrary to IIEC's alleged surprise at the line itemization of the Revenue Act tax, the April 2010 order specifically addressed the issue of itemizing the Revenue Act tax on customers' bills. The Commission emphasizes, in the hearings before the April 2010 order, the issue of line itemization was discussed and IIEC argued against collecting Revenue Act tax in this manner. The Commission maintains it specifically found Ameren Illinois "should recover the [Revenue Act] tax through a separate line item on bills," upon finding "ratepayers should be made aware of taxes they are being charged." In reaching the decision not to exclude the Revenue Act tax on customers' bills as Ameren Illinois suggested, the Commission observed, "As argued by Staff and IIEC, the Commission cannot agree that customers are not concerned about their bill total as long as increases in individual components are arguably reasonable."

¶ 156   The Commission further contends the language cited by IIEC, stating the Revenue Act tax should be recovered in base rates, followed discussion about whether the Revenue Act tax should be allocated as it was in 1997 or by kWh delivery. This ambiguity, according to the Commission, was cleared after the parties sought rehearing and the Commission, in June 2010, stated the following:

"With regard to the [Revenue Act] tax and its recovery, it was the Commission's intent in its Order to exclude the [Revenue Act] tax from the revenue requirement, treat the [Revenue Act] tax as a pass[-]through tax, have the [Revenue Act] tax recovered through a volumetric charge, and have the [Revenue Act] tax separately identified as a line item on the customer's bill as other pass-through taxes are identified."

¶ 157   "To be considered adequate, the Commission's findings merely need to be specific enough to allow intelligent review of the Commission's decision." *Central Illinois Public Service Co.*, 268 Ill. App. 3d at 480, 644 N.E.2d at 824. The Commission is not required to "make a finding on each evidentiary fact or claim." *Central Illinois Public Service Co.*, 268 Ill. App. 3d at 480, 644 N.E.2d at 824.

¶ 158   Here, the Commission's decision is supported by adequate findings. Contrary to IIEC's contentions, the Commission did not reverse its earlier decision when it released the June 2010 notice. The Commission clarified a misstatement that had been made and reiterated its intent to recover the Revenue Act tax through a separate line item on bills. When that intent was initially revealed in the April 2010 order, it followed a discussion by the parties regarding whether the Revenue Act tax should be recovered as a separate line item and how such treatment would affect rate moderation efforts. In light of rate-moderation concerns, the Commission reasoned customers should be aware of the individual components of their bills. These findings, in addition to those that determined the Revenue Act tax should be allocated and assessed by kWh delivered, are specific enough to permit intelligent review.

¶ 159            3. *IIEC Has Not Shown the Commission's Decisions Concerning*
                 *the Recovery of the Revenue Act Tax Are Not Supported by*
                 *Substantial Evidence or Are Arbitrary and Capricious*

¶ 160    IIEC challenges both the decision to treat the Revenue Act tax as a pass-through tax and the decision to collect the Revenue Act tax expense as a separate kWh charge, when other tax expenses are recovered in other ways. IIEC contends no party requested pass-through treatment of the Revenue Act tax. Moreover, IIEC argues the Commission improperly treats the Revenue Act tax as one imposed on utility customers and not on the utility itself.

¶ 161    When considering whether substantial evidence supports a decision, we are mindful of our responsibility to reverse a decision only when the appellant has affirmatively demonstrated a contrary result is clearly evident. See *Illinois Power Co.*, 382 Ill. App. 3d at 201, 887 N.E.2d at 683. We find IIEC has not met its burden.

¶ 162    Rate making is a function of the Commission. See *Central Illinois Public Service Co.*, 243 Ill. App. 3d at 446, 610 N.E.2d at 1373. That the Revenue Act tax should not be treated as a "pass through" tax is not clearly evident. In making its decision, the Commission had lawfully determined the Revenue Act allowed allocation of the Revenue Act tax expense based on kWh delivered. A corresponding decision was how to allocate that expense. Among available choices were to include the Revenue Act tax expense in the rate base or to list the amount allocated to each customer on the bill. The Commission made this decision after the possibility of line-item treatment was argued and considered. That no party raised the issue is of no consequence, because the Commission is not limited to the proposals presented it. See, *e.g.*, *City of Champaign v. Illinois Commerce Comm'n*, 141 Ill. App. 3d 457, 461, 490 N.E.2d 119, 121-22 (1986). IIEC has not shown how recovery through line itemization rather than including the expense in rate base is unreasonable.

¶ 163    IIEC also has not shown the decision to collect the Revenue Act tax expense through a kWh charge for DS-3 and DS-4 customers is arbitrary and capricious. IIEC contends the Commission "assumed the tax is imposed on utility customers." In support, IIEC cites the language from the April 2010 order, indicating the Commission "believes ratepayers should be made aware of the taxes they are being charged." IIEC contends the Revenue Act tax is a tax assessed on the utility and not the customers and the treatment of such is arbitrary and capricious.

¶ 164    We disagree with IIEC. The Commission did not assume the Revenue Act tax is a tax on utility customers. According to language in the April 2010 order, the Commission was fully aware the Revenue Act tax liability belonged to the utility, but also that it would be allocated among customers: "What remains unclear to the Commission, despite IIEC's assurances, is that the legislature did not intend for any change in how a *utility's* [Revenue Act] tax liability is allocated to customers." (Emphasis added.) A more fair and reasonable interpretation of the IIEC-cited Commission language is the Commission believed taxpayers should be aware they are effectively paying for these taxes. The Commission's approach reasonably does that and also allows Ameren Illinois to recover its tax expense, which it is allowed to do. See generally *Citizens Utilities Board*, 166 Ill. 2d at 123, 651 N.E.2d at 1095.

¶ 165                          D. Motion To Consolidate

¶ 166      After the April and May 2010 orders directing Ameren to recover the Revenue Act tax
           expense in base rates in existing kWh delivery charges for some customers and a new per
           kWh delivery charge for DS-4 and DS-5 customers, Ameren, according to an IIEC witness,
           filed tariffs that removed Revenue Act tax expense from base rates and collected them
           primarily through a rider as a line item on customers' bills. In June 2010, after petitions for
           rehearing had been filed, the Commission issued a notice that informed parties it had
           intended to exclude the Revenue Act tax from the revenue requirement and treat it as a pass-
           through tax, separately identified as a line item on customers' bills. The November 2010
           order on rehearing incorporated the Commission's June 2010 notice.

¶ 167      IIEC then made two filings in regard to this rate case: its first notice of appeal, case No.
           4-10-0976, and a second petition for rehearing. IIEC argued it filed the second petition for
           rehearing to preserve its right to challenge what it perceived to be a shift in the
           Commission's treatment of the Revenue Act tax expense. IIEC anticipated an argument
           section 10-113 of the Public Utilities Act (220 ILCS 5/10-113 (West 2008)), which does not
           allow argument on appeal on any grounds not set forth in an application for rehearing before
           the Commission, might prevent it from seeking review of the November 2010 order on
           rehearing. After the Commission denied its second application for rehearing, IIEC filed its
           second notice of appeal, case No. 4-11-0075.

¶ 168      On appeal, IIEC sought to consolidate case No. 4-11-0075 with consolidated case Nos.
           4-10-0962 and 4-10-0976. In March 2011, the Commission moved to dismiss case No. 4-11-
           0075 on jurisdictional grounds. We consolidated the appeals, but concluded we would
           consider the Commission's jurisdictional arguments with the case.

¶ 169      In opposing IIEC's motion to consolidate, the Commission, citing *Harrisonville
           Telephone Co. v. Illinois Commerce Comm'n*, 212 Ill. 2d 237, 243-47, 817 N.E.2d 479, 483-
           86 (2004), contends this court lacks jurisdiction over IIEC's second appeal, case No. 4-11-
           0075. The Commission maintains section 10-113(a) of the Public Utilities Act allows only
           one rehearing of a Commission's order absent the passage of two years' time. See 220 ILCS
           5/10-113(a) (West 2008). The Commission then argues the second appeal was untimely
           because it was not filed within 35 days of the service of the November 2010 order on
           rehearing. See 220 ILCS 5/10-201(a) (West 2008). The Commission further notes the
           question of issue preclusion, with one "possible exception," would not bar any of IIEC's
           claims on appeal. The Commission, citing IIEC's first application for rehearing, states IIEC
           challenged the Commission's April 2010 order's allocation of the Revenue Act tax. The one
           "possible exception," according to the Commission, is IIEC's failure to specifically reference
           the line itemization on customers' bills that was ordered in a different section of the April
           2010 order and could have been raised on the first application for rehearing.

¶ 170      IIEC, in its reply brief, maintains it did raise the issue of line itemization, an item
           included in Ameren Illinois's tax rider, in its first application for rehearing:

           "The Final Order did not authorize the removal of the [Revenue Act] Tax from base rates
           and their recovery through a rider. (See, Final Order generally.) However, the compliance
           rates filed by Ameren [Illinois] recover the [Revenue Act] Tax in Ameren's Tax

Additions Rider after its removal from base rates."

IIEC concludes because all of its arguments on appeal were presented in the first application of rehearing, all are properly presented to this court in case No. 4-10-0976. IIEC then "suggests that the jurisdictional issue, insofar as it affects the arguments made in this appeal, is moot."

¶ 171   We disagree with IIEC. The issues are properly preserved for review in case No. 4-10-0976. That alone does not render the issue of jurisdiction moot in case No. 4-11-0075. The question remains whether IIEC's second appeal complies with jurisdictional rules. We find it does not.

¶ 172   As the Commission contends, this court will not have jurisdiction to review a decision of the Commission unless an appeal is filed within 35 days of that decision. 220 ILCS 5/10-201(a) (West 2008). Section 10-113(a) of the Public Utilities Act mandates "[o]nly one rehearing shall be granted by the Commission," but a party may seek an additional hearing after two years. 220 ILCS 5/10-113(a) (West 2008). IIEC's petition for a second rehearing was improper and impermissible under section 10-113(a). The filing of the second application for rehearing did not extend the 35-day time period in which to file case No. 4-11-0075. See *Harrisonville Telephone Co.*, 212 Ill. 2d at 243-47, 817 N.E.2d at 483-86. We have no jurisdiction over case No. 4-11-0075 and dismiss the appeal.

¶ 173   IIEC argues we should not read sections 10-113(a) and 10-201(a) of the Public Utilities Act so strictly because it unfairly bars claims raised by the Commission for the first time after the first application for rehearing is filed. This argument, however, does not apply here because the record shows all of the claims IIEC seeks to raise in appeal case No. 4-11-0075 are properly before this court in appeal case No. 4-10-0976. No unfairness results to IIEC by the dismissal of case No. 4-11-0075.

¶ 174                          III. CONCLUSION

¶ 175   For the reasons stated, we dismiss case No. 4-11-0075 for lack of jurisdiction and affirm the orders of the Commission.


¶ 176   No. 4-10-0962, Affirmed.

¶ 177   No. 4-10-0976, Affirmed.

¶ 178   No. 4-11-0075, Dismissed.